In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 02-1320 & 02-1523

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

STANLEY STARKS and LATRAY MCMURTRY,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Eastern District of Wisconsin.
No. 01 CR 149—**Charles N. Clevert**, *Judge.*

SUBMITTED AND ARGUED SEPTEMBER 4, 2002*—
DECIDED NOVEMBER 4, 2002

Before FLAUM, *Chief Judge*, and CUDAHY, and KANNE, *Circuit Judges*.

KANNE, *Circuit Judge.* Stanley Starks and Latray McMurtry were indicted by a federal grand jury on (1) possession with intent to distribute more than 50 grams of cocaine base and (2) possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1). Starks pleaded guilty to the cocaine-base charge. McMurtry, however, went to trial, where he was found guilty on both counts. McMurtry appeals his conviction claiming there was insufficient evidence for the jury to conclude that

---

* Case No. 02-1320 was submitted without oral argument.

he possessed the drugs. Both Starks and McMurtry appeal the district court's two-level sentence enhancement under the U.S. Sentencing Guidelines Manual § 2D1.1(b)(1) for possessing a firearm during the commission of a drug-related offense. Because the evidence was sufficient to establish that McMurtry was in possession of the drugs and that weapons were present and connected to the underlying offense, we affirm both McMurtry's conviction and the defendants' sentences.

## I. HISTORY

For at least forty-five minutes on July 17, 2001, DEA agents Carol Mascari and Janene Spitaletto conducted surveillance before executing a search warrant at a suspected crack house at 3724 North 27th Street in Milwaukee, Wisconsin. In the course of their surveillance, agents Mascari and Spitaletto saw no one enter or leave the house. They did, however, watch as one woman came to the front door and waited a few seconds before she turned and left.

Additional DEA agents arrived on the scene in order to execute the no-knock warrant. With two hits of a concrete-reinforced steel battering ram, the agents broke down the front door, announced their presence, and gained entry to the house.

Once inside, DEA agent James Krueger saw McMurtry getting up from the living-room couch, and Starks standing at a dining-room table littered with drugs and drug paraphernalia. Seeing the agents, both defendants broke and ran through the dining room to the back of the house. Agent Krueger pursued them and found the defendants hiding in a back-bedroom closet. On that closet's top shelf, agents later discovered a single shoebox containing a loaded semi-automatic handgun. Scattered about the floor of the bedroom was approximately $200 to $300 in small bills.

After subduing the defendants, agents conducted a search of the entire house, which revealed more drugs and guns. Underneath the couch where McMurtry had been sitting, agents recovered a loaded revolver and a cellular phone. Within arm's reach of the couch on a television stand, agents recovered seventeen additional rounds of ammunition and another cellular phone. And about eight feet from the couch, between it and the dining-room table where Starks had been standing, was a paper plate full of "wet" crack cocaine sitting on a chair, drying with the aid of a box fan. On or near the dining-room table, agents recovered powder cocaine, more crack cocaine, and drug-manufacturing materials including a gram scale, a razor blade, knotted sandwich bags, and gem packs.[1] From the drawer of a nearby dining-room cabinet, agents removed another loaded handgun and a box of ammunition. In the kitchen, agents found another gram scale, a couple of hot plates, a glass beaker, and a box of baking soda. All told, agents recovered three loaded handguns, 116 grams of crack cocaine, 210 grams of powder cocaine, and the assorted drug-manufacturing paraphernalia from the house.

Apart from the drugs, guns, and paraphernalia, agents found little else. They found no bedroom furniture, no food in the kitchen, and no clothes in the closets. The kitchen door was fortified with a 2x4 and its window rigged with a sliding cardboard peephole device so that the occupants could see who was at the door without being identified themselves. The only personal effects recovered from the house were Starks's driver's license, which was found next to a pile of crack cocaine on the dining-room table, and a cardboard box containing a pair of Wisconsin license plates registered to McMurtry.

---

[1] Gem packs are small plastic bags originally designed to package small amounts of gems but are commonly employed by drug dealers to package small amounts of drugs.

At McMurtry's trial, DEA agents testified that the drugs, guns, and paraphernalia coupled with the house's condition at the time of the search indicated that there was an active narcotics-manufacturing operation in progress at 3724 North 27th Street. Agent Mascari testified that the beaker, hot plate, and baking soda found in the kitchen were being used to "cook up" the cocaine powder in order to make crack cocaine. The plate of "wet" crack cocaine sitting on a chair was being dried by the nearby box fan so that it could later be weighed, divided, and bagged for sale. She testified that the gram scales were being used to weigh out tenth-of-a-gram packages of crack cocaine, which were to be packaged for sale in the gem packs for about ten to twenty dollars each. Agents testified that the fortified back door and the placement of weapons throughout the house were a common feature of drug houses, and in this case were meant to protect the house—and, more specifically, the approximately $15,000 to $20,000 worth of drugs present there—from robbery. In short, the uncontested testimony given at trial established that this was a crack house with an active narcotics manufacturing operation in progress at the time of search.

On cross-examination, however, the DEA agents admitted that no one saw McMurtry cooking up, cutting, or packaging crack cocaine. They admitted that McMurtry's fingerprints were not recovered from any of the items found in the house. And although they estimated that the drugs found on the premises were worth as much as $20,000, they admitted McMurtry when searched had only two dollars in his pockets. The government, moreover, introduced no evidence McMurtry occupied, leased, or owned the property. In fact, the search warrant identified only "Romel LNU" (Last Name Unknown) as the occupant of the premises—there was some testimony that the Romel alias referred to Starks.

Citing these evidentiary issues, McMurtry argued that the government had failed in its burden of proof and, thus, put on no affirmative defense. At the conclusion of the evidence, the district-court judge announced that he was inclined to rule that the evidence was insufficient to go to the jury on the element of possession, but after taking briefs and hearing from both parties the following morning, he ruled otherwise and submitted the case to the jury, who returned guilty verdicts on both counts. At sentencing, McMurtry received concurrent 210-month sentences. He raised no objections at his sentencing hearing.

McMurtry appeals his conviction arguing that the government's proof merely established his presence at the house and was insufficient for the jury to conclude beyond a reasonable doubt that he possessed any of the drugs recovered there. For much the same reason, he also appeals his two-level enhancement under U.S.S.G. § 2D1.1(b)(1) for possession of weapons during a drug-related offense.

Starks, meanwhile, pleaded guilty at the outset to one count of possession with intent to distribute fifty grams of cocaine base. At sentencing, however, he objected to his being assessed a two-level increase under § 2D1.1(b)(1) of the sentencing guidelines for possession of a firearm or other dangerous weapon. The district court disagreed, finding that Starks failed to show that it was clearly improbable that the guns were connected with the offense. Since the government's proof that the defendants constructively possessed weapons remained unrebutted, the court applied the enhancement and imposed a 135-month sentence. Starks retained his right to appeal, and does so here, arguing that the district court clearly erred in applying the two-level enhancement.

The defendants' cases were consolidated on appeal. We address first McMurtry's sufficiency-of-evidence challenge

before turning to analyze both of the defendants' sentence enhancements.

## II.  ANALYSIS

### A.  *Sufficiency of Evidence*

We review sufficiency-of-evidence questions "in the light most favorable to the government and ask whether any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt." *United States v. Richardson*, 208 F.3d 626, 631 (7th Cir.) (quotations omitted), *cert. denied*, 531 U.S. 910 (2000); *United States v. Griffin*, 150 F.3d 778, 784 (7th Cir. 1998). Restated, we will overturn a guilty verdict only when the record contains no evidence, regardless of how it is weighed, upon which a rational trier of fact could find guilt beyond a reasonable doubt. *Griffin*, 150 F.3d at 784. We do not weigh the evidence or reassess the credibility of the witnesses. *Id.* at 784-85. And popular misconceptions aside, circumstantial evidence is no less probative of guilt than direct evidence. Indeed, "in some cases [circumstantial evidence] is even more reliable." *Id.* at 785 (quoting *United States v. Ranum*, 96 F.3d 1020, 1026 (7th Cir. 1996)). Moreover, the trier of fact is entitled to employ common sense in making reasonable inferences from circumstantial evidence. *Id.* at 785. As such, "the government's proof need not exclude every reasonable hypothesis of innocence so long as the total evidence permits a conclusion of guilt beyond a reasonable doubt; the trier of fact is free to choose among various reasonable constructions of the evidence." *United States v. Harris*, 271 F.3d 690, 703-04 (7th Cir. 2001) (quotation omitted). In asking us to overturn the jury's verdict, McMurtry acknowledges he bears a heavy burden.

To sustain a conviction under 21 U.S.C. § 841(a)(1) the government must show that the defendant (1) knowingly

or intentionally possessed cocaine (2) with the intent to distribute it (3) while knowing it was a controlled substance. *United States v. Windom*, 19 F.3d 1190, 1199 (7th Cir. 1994). Here, the only element in dispute is whether McMurtry "knowingly or intentionally possessed" the cocaine and cocaine base.

A defendant need not be caught red-handed in order to satisfy the possession element. *United States v. Martinez*, 937 F.2d 299, 305 (7th Cir. 1991). Rather, the government may prove constructive possession if it can show that the defendant exercised ownership, dominion, authority, or control over the illicit material. *Richardson*, 208 F.3d at 632; *United States v. Garrett*, 903 F.2d 1105, 1112 (7th Cir. 1990). "When the crime involves an intent to distribute or dispense drugs, this court has found that an accused only has control of narcotics when he has the authority—not legal authority, but the 'recognized authority in his criminal milieu'—to possess and determine the disposition of them." *Windom*, 19 F.3d at 1200 (citations omitted) (quoting *United States v. Manzella*, 791 F.2d 1263, 1266 (7th Cir. 1986)); *see also United States v. Staten*, 581 F.2d 878, 883 (D.C. Cir. 1978) ("[T]he critical inquiry for judges is whether the factfinder can reasonably conclude from the proof that the accused likely had some appreciable ability to guide the destiny of the drug."). Constructive possession need not be exclusive, and can be shared with others. *United States v. DiNovo*, 523 F.2d 197, 201 (7th Cir. 1975) (quoting *United States v. Davis*, 461 F.2d 1026, 1035 (3d Cir. 1972)).

When employing the constructive-possession doctrine, however, courts must be mindful not to sweep within the doctrine's purview the innocent bystander who is merely present while others engage in illegal drug activity. To avoid a tendency towards guilt by association, courts must attempt to distinguish the true possessor from the ordinary bystander. *Windom*, 19 F.3d at 1200. Conse-

quently, we have held that "mere proximity to the drug, mere presence on the property where it is located, or mere association, without more, with the person who does control the drug or the property on which it is found, is insufficient to support a finding of possession." *DiNovo*, 523 F.2d at 201 (quotation omitted).

McMurtry argues that the government failed to introduce any evidence that he possessed cocaine or cocaine base. All that the evidence establishes, he claims, was that he happened to be present at the house during the drug raid. He points out that the government did not prove either that he had any possessory interest in the premises or that he was in actual possession of the drugs at any time during the raid. Although the facts here present a close case, ultimately we disagree.

We begin our analysis by examining the context of McMurtry's presence. It is undisputed that McMurtry was present for at least forty-five minutes in a house where evidence of a significant crack-cocaine manufacturing operation was conspicuously strewn about. As much as $20,000 worth of cocaine and cocaine base—and the materials necessary to manufacture and process cocaine base—were sitting out on tables and chairs in plain view. There was evidence that at least some of this crack cocaine had been recently manufactured: agents discovered a pile of still "wet" crack cocaine drying out with the aid of the box fan when they entered the apartment. In short, McMurtry neither argues, nor could there be any credible claim that he was unaware of the fact that criminal conduct was occurring at the house.

And it would have been reasonable for the jury to infer that this crack-manufacturing operation was the only conduct occurring there. There were no beds; there was no food in the kitchen; there were no clothes in the closets. The back door was fortified with a 2x4 to prevent entry

and was equipped with a makeshift peephole device. The front door appeared to have been fortified as well, since it took two blows of a battering ram to break it down. Three loaded handguns were found in strategic locations throughout the house. *See United States v. Alvarez*, 860 F.2d 801, 829 (7th Cir. 1988) ("Experience on the trial and appellate benches has taught that substantial dealers in narcotics keep firearms on their premises as tools of the trade almost to the same extent as they keep scales, glassine bags, cutting equipment and other narcotics equipment."). To sum up, this was a crack house.

Agent Mascari testified that based upon her experience it was uncommon for drug dealers to entertain social callers at crack houses. In her opinion, entertaining would increase the drug dealer's risk of being robbed. As such, presence was a privilege reserved only for those who were participating in illegal drug activity. Indeed, the record indicates that while McMurtry gained access to and remained in a fortified location replete with evidence of criminal drug activity, others were not invited. At least one woman during the course of the agents' surveillance came to the front door of the house but did not gain access, even though she apparently knew that one "Romel" was known to occupy the premises. Other courts have found the mere-presence doctrine inapplicable in similar situations where defendants were granted access to and remained for extended periods of time in the presence of conspicuous criminal conduct:

> In these circumstances we cannot accept the hypothesis that participants in a distribution scheme would permit a noncontributing interloper to remain for an extended period of time in a small apartment while . . . conspicuous criminal conduct continued unabated. Such is not normally the conduct that one would expect of conspirators engaged in conduct which by its nature is kept secret from outsiders.

> Neither juries nor judges are required to divorce them-selves of common sense, but rather should apply to facts which they find proven such reasonable infer-ences as are justified in light of their experience as to the natural inclinations of human beings. As we frequently recognize, the factfinder may infer . . . that it runs counter to human experience to suppose that criminal conspirators would welcome innocent nonparticipants as witnesses to their crimes.

*United States v. Batista-Polanco*, 927 F.2d 14, 18 (1st Cir. 1991) (quotations omitted); *Staten*, 581 F.2d at 885 ("More critically, his presence in that one-room apartment reeking with tell-tale indicia of an ongoing drug-distribut-ing enterprise could rationally have been viewed as a privilege reserved exclusively for participants.").

In *Batista-Polanco*, the defendant was present for at least forty-five minutes and more likely as long as two hours in an apartment where a large-scale heroin-pack-aging operation was occurring in open view. Upon enter-ing the apartment, police immediately discovered 1500 heroin-filled packets, an assortment of heroin milling and packaging paraphernalia, and bulk heroin sitting in plain view on the kitchen table. About this table, police noted there were six chairs, and police arrested six in-dividuals from the apartment. Elsewhere in the apartment, police recovered an additional 4700 packets of heroin. The court concluded that, although wholly circumstantial, the totality of circumstances surrounding the defendant's arrest—including, most prominently, the openness and sheer scale of the criminal activity that occurred for at least forty-five minutes in his presence—was sufficient to refute his mere-presence argument. *Id.* at 18-19.

But as McMurtry correctly points out in his brief, the *Batista-Polanco* court in so finding also relied upon the reflexive inference that the six chairs at the heroin-strewn

kitchen table were occupied by the six individuals, including the defendant, arrested that day in the apartment. *Id.* Additionally, the First Circuit was quick to discredit the defendant's exculpatory testimony in light of the district court's finding that the defendant had lied when he claimed he was only present at the house for forty-five minutes since a police surveillant had testified that the defendant must have been there for two hours. *Id.* Take these factors away, McMurtry argues, and the court could not have affirmed the jury's guilty verdict.

Indeed, in a similar case distinguishing the constructive-possession and mere-presence doctrines, the D.C. Circuit relied not only upon the observation that the defendant's presence in a one-room apartment "reeking with tell-tale indicia of an ongoing drug-distributing enterprise" was a privilege reserved only for complicit coactors and, thus, "potently indicative of his involvement in the [drug] operation," but also cited (1) the defendant's actual possession of a key to the apartment, (2) the recovery of his identification card from a closet, and (3) an inference that he had participated in a last-ditch drug disposal effort as police attempted to enter the apartment, evidenced by the finding on his person of a small amount of heroin and money likely destined for a running garbage disposal. *Staten*, 581 F.2d at 885-86 & n.67. In holding that the defendant was in constructive possession of all the drugs recovered from the apartment, the D.C. Circuit opined that while mere presence, proximity, or association are insufficient in and of themselves to establish guilt, they "may establish a prima facie case of drug-possession when colored by evidence linking the accused to an ongoing criminal operation." *Id.* at 885. Examining a number of cases addressing the mere-presence doctrine, the *Staten* court noted that this "link" between presence and participation had been established elsewhere by evidence of flight or attempted flight, destruction of evidence, the

giving of incriminating statements or inconsistent testimony, or the recovery of the defendant's personal items from the premises. *Id.* at 885 & n.60; *see also United States v. Ratcliffe*, 550 F.2d 431, 434 (9th Cir. 1976) ("[W]hile mere proximity to illegal drugs, mere presence on the property where they are located, or mere association, without more, with persons who do control them is insufficient to support a finding of possession, . . . such proximity, presence, or association is sufficient when accompanied with testimony connecting the defendant with the incriminating surrounding circumstances." (citations omitted)). Thus, McMurtry argues, these cases cannot be read to have held the mere-presence doctrine inapplicable based solely on the duration of the defendant's presence and the openness of the criminal conduct.

Correct as he may be in arguing that the length of presence coupled with the openness of the illicit conduct may not, in and of itself, be sufficient to defeat the mere-presence doctrine, what McMurtry ignores is that here, as in *Batista-Polanco* and *Staten*, there are at least two additional factors that—when viewed in the total context of his presence and in the light most favorable to the government—further support the jury's verdict. First, McMurtry fled from police. Upon the DEA agents' announced entry, he and his codefendant Starks retreated to a back bedroom and hid in a closet (notably, that closet contained one of the three loaded handguns found in the house). "From the very infancy of criminal litigation, juries have been permitted to consider flight as evidence of consciousness of guilt and thus of guilt itself." *United States v. Harley*, 682 F.2d 398, 401 (2d Cir. 1982) (quotation omitted). Second, police recovered McMurtry's license plates from the house. We have previously recognized that the recovery of items belonging to the defendant can establish the appropriate nexus between the defendant and the illicit conduct and refute the claim of

mere presence. *United States v. Kitchen*, 57 F.3d 516, 519-21 (7th Cir. 1995).

Thus, the totality of the circumstantial evidence surrounding McMurtry's arrest was sufficient to refute his claims of mere presence and provided a rational basis upon which a jury could find guilt beyond a reasonable doubt. No case cited by McMurtry requires us to find otherwise. For instance, he relies on our application of the mere-presence doctrine in *United States v. DiNovo*, in which we reversed the conviction of a wife whose husband distributed heroin from a trailer where, at best, the two of them lived. 523 F.2d 197, 201-02 (7th Cir. 1975). In evaluating the evidence against the wife, we expressly noted that she was not discovered in the immediate area of unconcealed narcotics, and that the government must therefore justify her constructive possession by establishing her possessory interest in the trailer. *Id*. Unlike *DiNovo*, the government here does not argue, nor do we base our holding upon, McMurtry's ownership of the property in which the contraband was found. Thus, the evaluation of whether the evidence in *DiNovo* was sufficient to establish the defendant's possessory interest in the trailer—and therefore, over the concealed drugs found in it—is irrelevant here.

Much to the same effect is *United States v. Windom*, also cited by McMurtry, in which we held that the defendant's possession of a marked bill previously used in a controlled drug purchase was insufficient evidence to establish his constructive possession of a heroin-filled backpack recovered during a subsequent search of a house in which we was present. 19 F.3d 1190, 1200-01 (7th Cir. 1994). In that case, our discussion focused on the government's failure to establish any link between the possession of the marked bill and the concealed drugs recovered from the backpack. *Id*. There was no evidence about how Windom came to be in possession of the marked bill (he,

apparently, was not the observed seller of the drugs). Nor was there any evidence that the drugs purchased in the controlled buy had come from those later recovered in the backpack. Thus, we held his conviction could not stand. *Id.* Notably, there was simply no evidence that Windom knew about the presence of the concealed drugs recovered in the backpack. Conversely, Windom asserted no sufficiency-of-evidence claim on his conviction for a separate count of possession of cocaine based upon a previous search of the same premises where Windom was seen exiting a room in which drugs and drug paraphernalia were in open view. *Id.* at 1193, 1201.

The mere-presence doctrine means just what it says—presence and nothing more. That is not the case here: McMurtry's presence was extended; the criminal conduct was conspicuous, ongoing, and occurring in a location exclusively devoted to that criminal enterprise; testimony indicated it was unreasonable in those circumstances to expect individuals engaged in that criminal enterprise to accept social visits; McMurtry fled from police; and his license plates were recovered from the premises. Although each of these factors when viewed individually may be insufficient to refute the mere-presence doctrine, when considered in their totality and in the light most favorable to the government we find they provided sufficient basis for the jury to conclude that McMurtry possessed the "recognized authority in his criminal milieu" to exert dominion and control over the drugs and distinguish him from the "ordinary bystander" caught in the wrong place at the wrong time.

### B.  Firearm Enhancements

Both McMurtry and Starks appeal the district court's application of a two-level sentence enhancement for possession of a firearm during the commission of a drug-related offense arguing that neither had knowledge of the guns

found in the apartment. Starks objected to the enhancement at sentencing, preserving the issue for appeal. Thus, in Starks's case, we review the district court's factual determination in applying the enhancement under the clearly erroneous standard and will overturn that determination only if "after considering all the evidence, [we are] left with the definite and firm conviction that a mistake has been committed." *United States v. Messino*, 55 F.3d 1241, 1247 (7th Cir. 1995) (quotations omitted). Unlike Starks, McMurtry did not object to the enhancement at his sentencing hearing and has thus forfeited this issue on appeal. As such, we could only overturn McMurtry's enhancement if the district court committed a plain error that, if allowed to stand, would substantially impair the fairness and integrity of the judicial process. *United States v. Noble*, 246 F.3d 946, 955 (7th Cir. 2001). Since we hold that the district court did not clearly err in applying the enhancement as to Starks, we need not address whether the asserted error could withstand McMurtry's higher plain-error scrutiny.

The U.S. Sentencing Guidelines Manual § 2D1.1(b)(1) provides, "[i]f a dangerous weapon (including a firearm) was possessed, increase by 2 levels." U.S.S.G. § 2D1.1(b)(1) (2002). The commentary to this section states that "[t]he adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." *Id.* § 2D1.1(b)(1) cmt. n. 3. The enhancement accounts for the increased danger to law enforcement presented when drug dealers and traffickers arm themselves. *United States v. Cashman*, 216 F.3d 582, 587 (7th Cir. 2000).

Under § 2D1.1(b)(1), the government must first establish by a preponderance of the evidence that the defendant possessed a weapon in a place where drugs were present, before the burden of persuasion shifts to the defendant to demonstrate that it was clearly improbable

that the weapon was connected with the drug offense. *United States v. Grimm*, 170 F.3d 760, 767 (7th Cir. 1999). The government may meet its burden by showing actual or constructive possession. *See United States v. Wetwattana*, 94 F.3d 280, 283 (7th Cir. 1996). Possession of an object, whether actual or constructive, exists when a person exercises control over the object. *Id.* at 283-84 & n.4 (citing *United States v. Garrett*, 903 F.2d 1105, 1110 (7th Cir. 1990)). We have found that a defendant exercised control over guns—and therefore possessed them for purposes of § 2D1.1(b)(1)—when the defendant was within arm's reach of those guns at the time of arrest. *See id.* at 284 & nn.4-5 (finding defendant exercised control over and therefore possessed firearm contained in tissue box found sitting next to him in back seat of car; refusing to reach the issue of whether that control was indicative of actual or constructive possession).

Reviewing the evidence in this case, we are not convinced that the district court erred in finding that Starks and McMurtry possessed a firearm at the time of their arrest. First, we find there was sufficient circumstantial evidence to refute Starks's claim that he didn't know there were guns in the house. As discussed above, this was an active crack house with a significant amount of crack cocaine present. Agent Mascari testified that it was common for drug dealers to fortify crack houses with weapons in order to protect the drugs and drug proceeds from robbery. Indeed, Starks admitted at his sentencing hearing that he feared being robbed while working at the house that day. And even if all three guns found at the house were concealed, agents recovered multiple boxes of ammunition sitting in plain view of anyone in the house. It was reasonable for the district court to conclude from these facts that the defendants were aware of the presence of guns in the house:

> [W]e know that he was aware of the bullets. They were clearly visible. And anybody who sees bullets in

several places in an apartment that is not really a place where anyone lives or has personal effects[,] and anyone who is in that apartment with the drugs that Mr. McMurtry and Mr. Starks had[,] certainly had to be aware that guns were in or about the premises.

(R. 47 at 15:7-13.)

Second, both Starks and McMurtry ran to and were found hiding in a closet that housed a loaded firearm. That gun was recovered from a lone shoebox on the closet's top shelf—an area within reach of the defendants. As in *Wetwattana*, the fact that the weapon was found inside the shoebox is immaterial since there was "no evidence . . . that [the defendants were] unable to open the box and thereby immediately access the gun." *Wetwattana*, 94 F.3d at 284 n.5. Because the circumstantial evidence was sufficient to establish that both defendants knew about the presence of guns in the house and because those defendants exhibited control over one of those guns by running to and being found within reach of it at the time of their arrest, the district court did not clearly err in determining that they possessed a weapon for purposes of § 2D1.1(b)(1).[2]

---

[2] We pause for a moment to distinguish our recent decision in *United States v. Harris*, in which we held that the defendant's proximity to firearms during the course of a drug conspiracy was insufficient to support a § 2D1.1(b)(1) sentence enhancement absent evidence that the defendant had demonstrated ownership, authority, dominion, or control over at least one of the caches of weapons. 230 F.3d 1054, 1057 (7th Cir. 2000), *cert. denied*, 532 U.S. 988 (2001). In *Harris*, there was simply no evidence, only the unsupported argument of the government, that the defendant ever exhibited control over any of the weapons caches found to be present during the course of the conspiracy. *Id.* (citing *Windom*, 19 F.3d at 1200-01). Here, we have circumstantial evidence demonstrating control: Starks and McMurtry ran to

(continued...)

Once the government established that the defendants were in possession of weapons, the burden shifted to Starks to show that the weapons were not clearly connected to the offense. This he failed to do. The district court correctly inferred from the close proximity of the guns to the drugs recovered from the house that they were connected to the offense. *United States v. Zehm*, 217 F.3d 506, 517 (7th Cir. 2000); *Grimm*, 170 F.3d at 767 ("Guns found in close proximity to illegal drugs are presumptively considered to have been used in connection with the drug-trafficking offense."). We therefore find no clear error in the gun-possession enhancement and reiterate that we also find no plain error as to McMurtry's claim.

## III.  CONCLUSION

For the foregoing reasons, we affirm McMurtry's conviction and both the defendants' sentences.

A true Copy:

Teste:

_____
*Clerk of the United States Court of
Appeals for the Seventh Circuit*

---

[2] (...continued)

an armed location in the house, where they were found within reach of a loaded gun. As in *Wetwattana*, this evidence, coupled with the circumstantial evidence establishing that the defendants were aware of the presence of handguns in the apartment, is sufficient to support the district court's determination that defendants were in possession of a weapon at the time of their arrest.