**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Alfred MELTON, Defendant–Appellant.**

**No. 02–1703.**

United States Court of Appeals,
Seventh Circuit.

Argued June 11, 2003.

Decided Sept. 18, 2003.

Timothy J. Chapman, Office of the United States of America, Chicago, IL, for Plaintiff–Appellee.

Ronald J. Clark, Clark & Associates, Chicago, IL, for Defendant–Appellant.

Before POSNER, COFFEY, and RIPPLE, Circuit Judges.

## ORDER

After a jury found Alfred Melton guilty of bank robbery, 18 U.S.C. § 2113(a), the district court sentenced him as a career offender to 210 months' imprisonment. Melton appeals, arguing that there was insufficient proof to establish probable cause to support his arrest, that his conviction was based on inadmissible testimony showing him as the robber, and that the district court erroneously applied the career offender guideline in determining his sentence. We affirm.

## BACKGROUND

On December 7, 2000, a man robbed the Metropolitan Bank on West 26th Street in Chicago, Illinois. He approached counter # 7 and stated to Luz Garcia, the bank's vault teller, "Give me all your money or I'll

shoot. Do you want to die? I'll shoot you. Don't give that bait bills." After Garcia unlocked the cash drawer and gave the robber all of the $5.00 bills (totaling $470), he fled out the front door of the bank. Garcia and coworkers Elizabeth Orozco and Misael Diaz described the robber as a 25– to 30–year–old black male standing approximately 5'10" to 5'11" tall, weighing about 130 to 140 pounds, wearing a black cap, blue hooded sweatshirt, black pants, and white gym shoes. Surveillance photos of the suspect are consistent with this description.

During the robbery, Luz Garcia activated the bank's alarm, and called 911 immediately after the robber fled. At the time of the radio dispatch notifying police of the robbery, Sergeant Fernando Garcia of the Chicago Police Department ("CPD") was patrolling an area near the Metropolitan Bank. The description of the robber in the dispatch resembled that of a man Sergeant Garcia had observed loitering around the corner of 26th Street and Drake (an intersection near the Metropolitan Bank) about 20 minutes before the robbery. Sergeant Garcia had noticed that the man was wearing a black knit cap in an unique way ("up high, kind of like hugged in on the top" and "in a funny way, almost like a hat from Doctor Suess where he wears a hat a little high"), a blue hooded sweatshirt, and dark pants. After observing the man for several minutes, Sergeant Garcia continued on his patrol without stopping the man for questioning.

After hearing about the robbery in a radio dispatch, Sergeant Garcia searched unsuccessfully for the robber, and then went to the bank. At the bank he listened to bank employees and witnesses whose descriptions of the robber resembled the man Sergeant Garcia had seen loitering before the robbery "down to the hooded sweatshirt, the knit cap, height, weight,

and the funny way of wearing that cap." FBI agents also arrived at the bank and interviewed Sergeant Garcia and the bank's employees. At that time Sergeant Garcia stated that he was "more than sure I seen the person who robbed the bank, in my mind I have a good idea who it was, and what he looked like, and everything they are telling me seems to be the same person that I had seen." Several days later the FBI presented Sergeant Garcia with a flier including two bank surveillance photographs, and he confirmed that the suspect was the same individual he had observed loitering in the area 20 minutes before the robbery.

On December 18, 2000, Sergeant Garcia arrested Alfred Melton outside of a pawn shop approximately one and one-half blocks from the Metropolitan Bank. While on patrol, Sergeant Garcia had seen Melton pulling a television from a car parked on 26th Street and delivering it to the pawn shop. From a distance of 12 feet, Sergeant Garcia recognized Melton as the robber depicted in the bank surveillance photographs and FBI flier. Indeed, Sergeant Garcia and bank employees Garcia, Orozco and Diaz, who had witnessed the crime, all noted at lineups that Melton was even wearing the same clothes when he was arrested that he wore at the time of the robbery. Sergeant Garcia called for backup officers to assist him, and they assisted in placing Melton under arrest.

On the same day as Melton's arrest, CPD officer Joseph Laskero conducted a lineup for two of the bank employees in order that he might ascertain whether they could identify Melton as the robber. As lineup fillers, Officer Laskero chose four other inmates who resembled Melton in height, weight, race, clothing, and other characteristics. He instructed the bank employees that they should carefully observe each of the individuals in the lineup,

and that they were only to choose one as the robber if they were sure that they could identify him. The two employees, Luz Garcia and Misael Diaz, both conclusively identified Melton as the robber. In another lineup conducted days before trial on September 7, 2001, bank employee Elizabeth Orozco positively identified Melton as the robber, and her coworker Yesenia Mariscal stated that she was 90% certain of that assessment.

Following the initial lineup, the CPD transferred Melton to FBI custody for questioning. Melton executed a written waiver of his rights and agreed to be interviewed after the agents gave him the standard *Miranda* warnings. The agents then showed Melton several of the bank surveillance photographs and asked if he recognized anyone in the photos. Melton, shaking his head, replied that the robber "looks just like me. You know how everybody has a twin out there. This is mine."

The trial court, after denying Melton's motion to quash his arrest and suppress the evidence allegedly arising from it, admitted testimony from the lineup identifications, as well as Melton's statement that the robber looked like his "twin." On September 14, 2001, a jury convicted Melton of one count of bank robbery, in violation of 18 U.S.C. § 2113(a). After finding that Melton had a prior controlled substance conviction and a prior state robbery conviction, the district court applied the career offender guideline and sentenced him to 210 months' imprisonment, restitution of $470, and a special assessment of $100, as well as three years of supervised release. Melton filed a timely appeal.

## DISCUSSION

### I. Melton's Motion to Quash His Arrest.

On appeal Melton initially contends that the district court erred in denying his motion to quash his arrest and suppress the lineup identifications and his statement that the robber looked like his "twin" without a hearing. He asserts that Sergeant Garcia's observation of him immediately prior to, or within 20 minutes of, the bank robbery, in combination with the bank surveillance photos and FBI flier, gave rise to reasonable suspicion to conduct an investigative stop but did not constitute probable cause to make the arrest. An officer has probable cause to arrest if he reasonably believes, in light of the facts within his knowledge at the time, that the suspect had committed or was about to commit an offense. *See Driebel v. City of Milwaukee,* 298 F.3d 622, 639 (7th Cir.2002). Although we review the district court's assessment of probable cause *de novo,* we accept findings of fact unless they are clearly erroneous. *Id.*

Melton raises two frivolous critiques of the officers' assertion that Sergeant Garcia's visual identification of Melton gave them probable cause to arrest Melton. First, Melton argues that the photographs in the FBI flier were so "hazy" that they rendered the subject unidentifiable. The district court disagreed, calling that assessment "unpersuasive." Regardless, Sergeant Garcia also relied on witness descriptions, surveillance videos, and his own recollection, not merely the photographs in the FBI flier. Second, Melton asserts that the description of the bank robber contained in the FBI flier was "completely different" from his own physical characteristics. In reality, the flier was slightly different in two respects: age and facial hair. The flier described the robber as a dark-complected black male, with black hair and brown eyes, 20 to 30 years old, 5'10", 140 pounds, and wearing a black skullcap, navy hooded sweatshirt, black shirt, black pants, and white shoes. At the time Melton was 39, 5'9", 150 pounds, and

wore a moustache and goatee. Melton's claim that these small variations in description defeat probable cause dramatically overstates these discrepancies.

■ We are of the opinion that the combination of all the information Sergeant Garcia had at his disposal was sufficient to establish probable cause even though other witnesses who contributed to the FBI flier described him somewhat differently. *See Tangwall v. Stuckey,* 135 F.3d 510, 516–17 (7th Cir.1998); *United States v. Scheets,* 188 F.3d 829, 839 (7th Cir.1999). Melton does not contest the fact that Sergeant Garcia saw him outside the Metropolitan Bank 20 minutes before it was robbed, nor does he dispute that the bank surveillance videos and Garcia's descriptions of Melton were consistent with each other. Specifically, Garcia testified that the descriptions were identical "down to the hooded sweatshirt, the knit cap, height, weight, and the funny way of wearing that cap." Moreover, Sergeant Garcia testified that the bank surveillance photographs depicted the same man that he saw outside the bank 20 minutes before the robbery. As we have held, recognition of the suspect based on surveillance photographs may be sufficient alone to establish probable cause. *United States v. Springs,* 17 F.3d 192, 194 (7th Cir.1994). Taking all of these observations into consideration, Sergeant Garcia still professed that he was "positive, 100 percent" certain when he made the arrest that Melton was the man he had observed outside the bank. Thus, the district court's ruling denying Melton's motion to suppress the evidence stemming from his arrest, including the lineup evidence and his statement that the robber looked like his "twin" was proper. Because Melton failed to raise a disputed material issue of fact, the district court also properly denied the motion without a

hearing. *See United States v. Utecht,* 238 F.3d 882, 887 (7th Cir.2001).

## II. Admission of Testimony Regarding Identification.

■ Melton also challenges the district court's admission of certain testimony regarding witnesses' identifications of him as the perpetrator of the robbery. Initially, Melton argues that the district court erred by admitting at trial lineup evidence and testimony identifying him as the bank robber. He asserts, for the first time on appeal, that the lineups in which bank employees were asked to identify the perpetrator were suggestive. Specifically, Melton argues that the lineup was suggestive because the bank tellers were provided with photographs of the perpetrator prior to the participation in the lineup. Because motions to suppress evidence must be filed prior to trial, *see* Fed. R.Crim.P. 12(f), Melton's failure to raise this claim below constitutes a waiver of his right to appellate review, *see United States v. Mancillas,* 183 F.3d 682, 703 (7th Cir. 1999).

In addition to the lineup identification testimony, Melton also contends that the district court erred by admitting his post-arrest statement that the perpetrator in the bank surveillance photographs looked like his "twin." The court denied Melton's in limine motion to exclude the statement, holding that it was an admission of a party opponent under Federal Rule of Evidence 801(d)(2)(A), which specifies that a "statement is not hearsay if ... [t]he statement is offered against a party and is the party's own statement."

■ In his appellate brief, Melton seems to concede that his statement fits within Rule 801(d)(2)(A), but instead argues that the evidence should have been excluded because it was more prejudicial than probative, *see* Federal Rule of Evi-

dence 403, a determination that his court reviews for abuse of discretion, *see Jenkins v. Chrysler Motors Corp.,* 316 F.3d 663, 664 (7th Cir.2002). But the only dispute in the case was as to the identity of the robber, and Melton's statement is highly probative of this issue. Melton's argument that jurors could be prejudiced by the statement is unpersuasive in that all admissions are prejudicial in that they tend to prove defendant's guilt. Accordingly, the district court was correct to admit the statement into evidence.

### III. Sentencing.

Melton also contests the district court's decision to sentence him as a career offender under U.S.S.G. § 4B1.1. He argues that neither his instant offense nor a prior conviction for robbery were "crimes of violence" for purposes of that section and, in any case, such a determination should have been made by a jury beyond a reasonable doubt. At sentencing, Melton unsuccessfully moved for a downward departure, and he includes the argument in his statement of issues on appeal, but failed to raise it in his argument. Because the district court applied the career offender provision, Melton had a total offense level of 32 and a criminal history category of VI, resulting in a guideline range of a possible 210 to 262 months' imprisonment. The statutory maximum sentence for bank robbery is 240 months' imprisonment, *see* 18 U.S.C. § 2113(a), and the district court imposed a term of 210 months. Had the district court chosen not to apply the career offender adjustment, Melton would have had an offense level of 24, and the guideline range would have been 100 to 125 months' imprisonment. *See* U.S.S.G. § 5A (table).

In deciding to apply a career offender adjustment to Melton's sentence, the dis-

trict court followed Guideline § 4B1.1, which requires that:

> (1) the defendant was at least eighteen years old at the time the defendant committed the instant offense of conviction; (2) the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense; and (3) the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense.

U.S.S.G. § 4B1.1. At the time of his instant offense, Melton was an adult, and he concedes that he has been convicted of one prior controlled substance violation. He had one conviction for robbery on another occasion by the State of Illinois court system.

■ Melton's first argument on appeal is that his offense of conviction was not a "crime of violence" for purposes of § 4B1.1. Melton failed to raise this argument before the district court at sentencing; therefore, he has forfeited the claim, and we review for plain error. *See* Fed. R.Crim.P. 52(b); *United States v. Martin,* 287 F.3d 609, 614 (7th Cir.2002); *United States v. Starks,* 309 F.3d 1017, 1026 (7th Cir.2002). In any event, a crime of violence is defined as:

> any offense under federal or state law, punishable by imprisonment for a term exceeding one year, that (1) has as an element the use, attempted use, or threatened use of physical force against the person of another, or (2) is a burglary of a dwelling, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another.

U.S.S.G. § 4B1.2(a). Robbery, because it involves the threat or use of force, is *per se* a crime of violence under this guideline. U.S.S.G. § 4B1.2, comment. (n.1); *United*

*States v. Jones*, 235 F.3d 342, 345 (7th Cir.2000). Finally, the statute under which Melton was convicted, 18 U.S.C. § 2113(a), requires the use of force, violence, or intimidation. The record sets forth that when Melton robbed the Metropolitan Bank, he stated "Give me all your money or I'll shoot. Do you want to die? I'll shoot you. Don't give that bait bills." Accordingly, the district court properly concluded that Melton's bank robbery was a crime of violence for purposes of the guidelines.

Second, Melton asserts on appeal that his prior state conviction for robbery involved a mere "purse snatching" rather than a crime of violence. The state statute under which Melton was convicted has as an essential element the threat or use of force, *see* 720 ILCS § 5/18–1, and robbery is *per se* a crime of violence under § 4B1.2(a). Even if we departed from our case law confining the inquiry to the charging document and statutory definition, *see United States v. Cole*, 298 F.3d 659, 661 (7th Cir.2002), Melton's argument would fail. The record indicates, and Melton concedes, that during the purse snatching he punched the victim and knocked her to the ground. As a result, the district court properly took into account Melton's prior purse snatching robbery conviction, for it is a violent crime under the career offender guideline.

Finally, Melton asserts that even if the career offender guideline could have been appropriately applied, the determination should have been made by a jury beyond a reasonable doubt. *See Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) ("Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt."). Again, Melton failed to raise this argument below, and therefore it is subject to plain error review. *See Starks*, 309 F.3d at 1026. But in any event, we disagree. Melton concedes that his argument seeks to "break new ground," because Apprendi explicitly does not require juries to determine the fact of a prior conviction, and regardless, he was not sentenced beyond the statutory maximum. *United States v. Leonard*, 289 F.3d 984, 989 (7th Cir.2002) ("Apprendi does not apply in cases where the actual sentence imposed is less severe than the statutory maximum."). Accordingly, the district court's action in applying the career offender adjustment without submitting the question to the jury was proper.

## CONCLUSION

We AFFIRM the judgment of the district court.