UNITED STATES of America, Plaintiff–Appellee,

v.

Merlin E. FLOWERS, Defendant–Appellant.

No. 02–3358.

United States Court of Appeals, Seventh Circuit.

Argued April 16, 2003.

Decided Nov. 20, 2003.

John K. Mehochko, Office of the United States Attorney, Rock Island, IL, for Plaintiff–Appellee.

George F. Taseff, Office of the Federal Public Defender, Peoria, IL, for Defendant–Appellant.

Before POSNER, COFFEY, and ROVNER, Circuit Judges.

### ORDER

On May 16, 2002, Merlin E. Flowers was convicted in the United States District Court for the Central District of Illinois of one count of possession with intent to distribute cocaine and cocaine base, in violation of 21 U.S.C. § 841(a)(1).[1] On appeal,

---

1. In addition to the possession with intent to distribute charge, Flowers was originally charged with three other crimes: (1) conspiracy to distribute cocaine and cocaine base, (2) using and carrying a firearm during a drug-trafficking crime, and (3) being a felon in possession of a firearm. Prior to the end of trial (on May 14, 2002), the court dismissed the two firearms charges on the Government's motion and, at the close of the Government's case (on May 16, 2002), the court granted the Defendant's motion for judgment of acquittal on the conspiracy charge. The remaining charge went to the jury, and, after hearing the evidence and applying the relevant law, the jury found the Defendant guilty of possession with intent to distribute cocaine and cocaine base.

Flowers argues for reversal of his conviction, alleging that: (1) the prosecutor improperly referenced his alleged post-arrest "silence" at trial, in violation of his Fifth Amendment self-incrimination and due process rights, and (2) there was insufficient evidence to prove he was in possession of the drugs (cocaine and cocaine base) at the time of his arrest. We affirm.

## I. Background

On May 4, 2001, agents from the Quad Cities Metropolitan Enforcement Group ("QCMEG") arrested one Michael Bennett on charges of possession of cocaine, methamphetamine, and marijuana. Bennett agreed to cooperate and thereafter participated in a "controlled" purchase of drugs from his supplier, Emil Dahmers. That same day, before proceeding with the controlled buy, the agents searched Bennett for possession of any other moneys, and thereafter provided him with $300 in prerecorded money, and placed him under surveillance and observed him as he drove to Dahmers's house to purchase cocaine. Approximately five minutes after Bennett arrived at Dahmers's residence, agents observed Dahmers exit the house and drive to an apartment building later determined to be Flowers's residence (827 18th Street). Several minutes after entering the Defendant's apartment, Dahmers returned and entered his vehicle.

As Dahmers was driving to his residence (where Bennett was waiting for the delivery of the cocaine), the QCMEG agents attempted to pull Dahmers over for a traffic stop, as they suspected he realized he was being followed by the police. Dahmers refused to comply and stop his vehicle; instead, he jumped a curb and drove over a sidewalk onto a service road in an attempt to flee. As Dahmers proceeded to drive down the service road with the police in hot pursuit, he was observed dumping white powder (which the agents suspected to be cocaine) out of his car window.

Eventually, the QCMEG agents succeeded in forcing him to stop his vehicle in a church parking lot, took him into custody and arrested him.

Shortly thereafter, Dahmers agreed to cooperate, and, during an interview, admitted that in the past he had frequently purchased crack and powder cocaine from Flowers at his residence (827 18th Street, Apartment 12). Dahmers went on to inform the agents that Flowers stored his drugs in an upstairs apartment (Apartment 22) owned by the Defendant's cousin, Paul Cummings. Based upon their investigation, including Dahmers's statements, the agents obtained warrants to search Apartments 12 and 22, located at 827 18th Street, Moline, Illinois.

When the agents entered Apartment 12, Flowers, his live-in girlfriend, Anita Ramirez, and his friend, Kelvin Bell, were all inside the apartment. Agents proceeded to search the apartment and, inside the bedroom, recovered $8,010 in cash from a travel bag (underneath the bed), and $1,609 in cash-including the $300 in marked bills used in the Bennett–Dahmers transaction-from a bedside table. Also inside Apartment 12, agents found a set of keys to Apartments 12 and 22, letters which listed the Defendant's address as "827 18th Street, Apartment 12," as well as two cell phones, and a pager.

A number of other agents proceeded upstairs to search Apartment 22 and, after gaining entry, recovered various items of drug paraphernalia, including a digital scale, a plastic bowl containing 194.2 grams of cocaine, and a plastic bag holding 13.4 grams of cocaine from a kitchen cabinet in the apartment. Also in the cupboard, resting on a plastic plate, was Flowers's gym membership card, as well as an additional 80.6 grams of crack-cocaine. Forensic fingerprint tests revealed the Defendant's prints on a paper plate located

under the plastic plate containing crack-cocaine. On the other side of the kitchen, agents located a drawer full of "corner-cut" plastic baggies.[2]

After Flowers's arrest he was given his *Miranda* warning, and waiving his rights proceeded to answer the questions of QCMEG agent Jeffrey Hayes. Agent Hayes testified at trial that, during this interview, Flowers admitted that the keys and cash found in Apartment 12 during the search belonged to him, but went on to claim that part of the cash found in his bedroom ($2,000) came from his mother, and that he had earned the rest of the money through part-time employment in the roofing and contracting business. During direct questioning at trial, the prosecutor asked Agent Hayes: "Did you ask the Defendant [Flowers] if he knew who owned the narcotics, the cocaine and crack cocaine ... found in Apartment No. 22?" (Tr. at 138.) Over defense counsel's objection,[3] Hayes answered: "Yes. I asked Mr. Flowers who the narcotics belonged to, and he stated that he did know; however, he would not inform me of that person's name." (*Id.*) Defendant's girlfriend, Ramirez, also took the stand, and while testifying stated that, during the year prior to his arrest, Flowers had been staying with her in Apartment 12 four to five nights a week. Contrary to the Defendant's assertion that he had earned part of the $9,919 doing roofing and contracting work, Ramirez testified that to the best of her knowledge Flowers had never held a job that year, and that he "stay[ed] at

home at [her] apartment" during the day while she went to work. (*Id.* at 115)

Dahmers also testified and recounted that he often purchased powder cocaine and crack-cocaine from Flowers, (*id.* at 148) (testifying that, each day, he would buy drugs "[a]s many times [as] [he] could get a hold of [the Defendant] and ... had money"), and that Flowers kept his drugs "upstairs" in Paul Cummings's apartment (Apartment 22). (*Id.* at 151.) Consistent with the physical evidence recovered at the scene, Dahmers stated that, on the day of his arrest (May 4, 2001), the Defendant was keeping his drugs in the kitchen of Apartment 22, "in a bowl" and "on a plate" on the kitchen counter, and that, incident to their drug transaction, he (Dahmers) had observed that the Defendant used his gym membership card to scoop "up [the drugs] and put [them] on the scale." (Tr. at 154–55.) Phone records subpoenaed established that, between January and May of 2001, Dahmers had called the Defendant's phone number at least 210 times, and that Flowers had called Dahmers's phone number approximately 118 times during the same time frame, thus supporting Dahmers's testimony that he had frequently purchased drugs from Flowers and arranged the drug purchases by phone.

The prosecution also presented the testimony of Flowers's cousin, Paul Cummings, who likewise provided corroborating evidence of Flowers's drug-trafficking activities. Cummings, who owned Apartment 22, testified that approximately one month

---

**2.** An agent testified that "corner-cut" plastic bags are often used to store drugs in distributable amounts. (Tr. at 84–85.)

**3.** When the prosecutor asked Hayes this question during direct examination, Defense counsel objected, arguing that Flowers had been merely asserting his right to remain silent, and that the statement thus could not be used

against him under *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). After a sidebar discussion of the issue, counsel's objection on the record was overruled in the absence of the jury. Defense counsel then asked that "the record ... reflect our *Doyle v. Ohio* objection" and requested permission to "proceed without having to object further." (Tr. at 137.)

before Flowers's arrest on one occasion in particular, he observed Flowers sitting at the kitchen counter of his apartment, handling a "little small bag" of white powdery substance which he suspected was an illegal drug. Cummings went on to deny that he personally ever had any involvement in Flowers's drug-related activities.

The jury convicted Flowers of possession with the intent to distribute cocaine and at least 50 grams of cocaine base, in violation of 21 U.S.C. §§ 841(a) and (b). On September 11, 2002, the district court sentenced Flowers to 240 months in prison, to be followed by ten years of supervised release, and ordered him to pay a $1,500 fine and $100 special assessment.

## II. Analysis

Flowers raises two issues on appeal. First, he claims that the prosecutor's questioning of Agent Hayes regarding his (Flowers's) post-*Miranda* statement, and the prosecutor's subsequent reference to such statement during closing argument, infringed his Fifth Amendment due process rights under *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). Flowers also argues that the evidence the Government presented was insufficient to establish that he had possession of the cocaine and cocaine-base found in Apartment 22.

### A. Fifth Amendment Claim

This court generally reviews a claim of constitutional error *de novo*. *See United States v. Kirschenbaum*, 156 F.3d 784, 792 (7th Cir.1998) (citing *United States v. Wicks*, 132 F.3d 383, 386) (7th Cir.1997). In this case, the Government claims that

we should review the Defendant's Fifth Amendment claim for plain error, because the Defendant failed to expressly object to the prosecution's reference to Flowers's post-arrest statement during the closing argument. *See Lieberman v. Washington*, 128 F.3d 1085, 1095 (7th Cir.1997) ("[b]ecause the trial judge was never called upon to rule whether the State's cross-examination and/or closing statements were violative of *Doyle*, Lieberman waived this argument on appeal unless 'plain error' is manifest"). We disagree with the Government's contention, for a reading of the transcript reveals that defense counsel *did* make a Fifth Amendment objection to the prosecutor's line of questioning during the direct examination of Agent Hayes, and thus hold that counsel did preserve his objection for the remainder of the trial (including closing arguments). (*See* Tr. at 137) ("So may the record then reflect our *Doyle v. Ohio* objection, and we will just proceed without our having to object further?"). Accordingly, we review the Defendant's Fifth Amendment claim *de novo*. *United States v. DeGeratto*, 876 F.2d 576, 585 (7th Cir.1989).

In *Doyle v. Ohio*, 426 U.S. 610, 617–618, 96 S.Ct. 2240, 2244–2245, 49 L.Ed.2d 91 (1976), the Supreme Court held that the use of a defendant's post-*Miranda* silence for impeachment purposes is unconstitutional, as it violates a defendant's right to due process.[4] The Court opined that, because the *Miranda* warning contains an "implicit" assurance that "silence will carry no penalty" at trial, it would be "fundamentally unfair and a deprivation of due process to allow the arrested person's [post-*Miranda*] silence to be used to im-

---

4. Although *"Doyle* involved a state prosecution [and due process guarantees under the Fourteenth Amendment], it applies identically to federal prosecutions under the Fifth Amendment." *United States v. Balter*, 91 F.3d 427, 439 n. 9 (3d Cir.1996) (citation omitted).

*See also United States v. Gant*, 17 F.3d 935 (7th Cir.1994) (addressing an alleged *Doyle* violation in the context of a federal prosecution); *United States v. Davenport*, 929 F.2d 1169, 1174 (7th Cir.1991) (same).

peach an explanation subsequently offered at trial." *Id.* at 618.

■ The Defendant in his appeal claims that under *Doyle,* it was unconstitutional for the prosecutor to solicit trial testimony from Agent Hayes regarding the Defendant's post-*Miranda* statements (post-arrest interview). In particular, the Defendant contends that his response to Hayes's inquiry as to who owned the drugs in Apartment 22 (*i.e.,* that "he did know [who owned the drugs in Apartment 22]; however, he would not inform [Agent Hayes] of that person's name" (Tr. at 133)) constituted *"silence"* under *Doyle,* and thus should not have been introduced to the jury at trial.

We do not agree, for Flowers's case is distinguishable from *Doyle.* Unlike the defendants in *Doyle,* Flowers did not remain *silent* when questioned by the agents. Instead, after receiving his *Miranda* warning, Flowers voluntarily opted to pick and choose the responses he gave to the agents' queries. Thus, the statement in question—*that he (Defendant) did know who owned the drugs, but would not say who it was*—was clearly an affirmative answer, rather than silence. Nothing in *Doyle* precludes the prosecution from presenting at trial a defendant's prior affirmative statement (answer).

Considering the facts in this case, the Supreme Court's holding in *Anderson v. Charles,* 447 U.S. 404, 100 S.Ct. 2180, 65 L.Ed.2d 222 (1980) is most instructive. In *Anderson,* the Supreme Court expressly held that *Doyle* does not apply in situations where "a defendant ... voluntarily speaks after receiving *Miranda* warnings [because he] has not been induced to remain silent." *Id.* at 408. Here, as in *Anderson,* before the Defendant made his statement regarding who owned the drugs in Apartment 22, the Defendant had already answered a number of *prior questions*;[5] thus, his affirmative statement (that "he did know [who the owner of the drugs was]; however, he would not inform [Agent Hayes] of that person's name") was not silence, but rather an admission that he knew the identity of the drug owner but refused to reveal the party's name to Agent Hayes. *See also Lindgren v. Lane,* 925 F.2d 198, 201 (7th Cir.1991) (holding that an agent's testimony regarding defendant's compound statement that he had been out fishing all night, but "he didn't wish to say any more" was not a *Doyle* violation); *United States v. Crowder,* 719 F.2d 166, 168, 172 (6th Cir.1983) (concluding that a defendant's post-*Miranda* statement about his connection with stolen goods, followed by a refusal to later re-tell his story to FBI agents did not fall within the parameters of "silence" under *Doyle*). Accordingly, when a defendant gives limited, self-serving statement, he gives a statement; thus, Agent Hayes's testimony regarding Flowers's affirmative statement was properly admitted.

■ Furthermore, even if Hayes's testimony stating that Flowers refused to inform the officer of the name of the owner of the drugs could be construed as "silence," this would not rise to the level of a constitutional violation, as Flowers was neither prejudiced by the admission of the Defendant's statement (Hayes's testimony), nor by the prosecutor's reference to such statement during closing argument. During closing, the prosecutor stated:

"[Flowers] also said he knew who owned the drugs, but he wouldn't say who that

---

5. After reading Flowers his *Miranda* warnings (and before he asked Flowers about the ownership of the drugs), Agent Hayes asked the Defendant a number of questions and he freely answered. Specifically, Hayes asked Flowers where the money found in Apartment 12 had originated, whether the key ring belonged to him, and who resided in Apartment 22— and Flowers voluntarily answered each of these questions. (Tr. at 130–33.)

person was. Now, I would suggest to you that is a false statement by Defendant. He knew whose the drugs were all right, but the second half [of that statement] was not true because he owned the drugs. He owned the drugs and he wasn't going to say. He was just trying to think fast when being questioned by the police, d[id]n't want to look guilty, and [was] trying to come up with something." (Tr. at 275.)

Considering the wealth of evidence of Defendant's guilt, any error caused by this statement of the prosecutor in his closing argument was harmless.

Constitutional error is harmless if it had no "substantial and injurious effect or influence in determining the jury's verdict." *Aleman v. Sternes*, 320 F.3d 687, 689–690 (7th Cir.2003) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 623, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993)). As we have stated previously, "[a]n error is harmless if the other untainted incriminating evidence is overwhelming." *United States v. Manganellis*, 864 F.2d 528, 539 (7th Cir.1988).

In this case, an abundance of incriminating evidence, direct and circumstantial both pointed to the Defendant's ownership and control of the cocaine found in Apartment 22. Not only did Flowers admit that he owned the set of keys identified as being keyed to Apartment 22, agents who searched the apartment found his gym membership card lying on top of a plate of cocaine in the kitchen, as well as various drug paraphernalia (a digital scale, a plastic bowl containing 194.2 grams of cocaine, and a plastic bag holding 13.4 grams of cocaine). Additionally, Flowers's fingerprint was found on a plate beneath the cocaine, and the marked $300 in cash (used earlier that day in a drug transaction) was discovered in Flowers's bedroom at the time of his arrest. Witnesses Dahmers and Cummings sealed the case against Flowers, testifying that they had seen Flowers in possession of cocaine (and, according to Dahmers, actually dealing cocaine) in Apartment 22.

Considering the plethora of evidence of Flowers's guilt, we are convinced that the prosecutor's brief mention of Defendant's post-arrest statements during closing argument had little, if any, impact at all on the jury's decision, much less a "substantial effect." Thus, even were we to determine that the court had committed any error in dealing with the admission of the Defendant's post-*Miranda* statement about ownership of the drugs, we would deem it to be harmless error.[6]

---

**6.** Although Flowers bases his argument for reversal of his conviction primarily on *Doyle*, which addresses a defendant's *due process* rights, Defendant also refers to his Fifth Amendment right against self-incrimination to support his argument for reversal. Flowers's Br. at 20–21. "The right against self-incrimination is violated only when: (1) it was the prosecutor's manifest intention to refer to the defendant's silence; or (2) the remark was of such a character that the jury would 'naturally and necessarily' take it to be a comment on the defendant's silence." *Rodriguez v. Peters*, 63 F.3d 546, 561 (7th Cir. 1995) (quoting *United States v. Donovan*, 24 F.3d 908, 916 (7th Cir.1994)). Again, we note that, during his arrest, Flowers was informed of his right to remain silent, but instead of remaining silent, chose to answer Agent Hayes's interrogatories. Thus, in recounting on the stand the nature of his post-arrest interview with Flowers, Agent Hayes did not reference Defendant's *silence*, but rather Flowers's affirmative statement that he knew who owned the drugs but would not identify that person. Moreover, to the extent that the district court might have committed *any* Fifth Amendment error in admitting Hayes's testimony (or allowing the prosecutor to refer to such testimony in his closing statement), such error was harmless beyond a reasonable doubt in light of the conclusiveness of the wealth of evidence received in evidence against Flowers at trial (eyewitness testimony, physical evidence of drug paraphernalia, keys to Apartment 22, etc.). *See supra* at 10–11.

## B. Insufficient Evidence Claim

Flowers next claims that the evidence presented at trial was insufficient to support his conviction for possession with intent to distribute cocaine and cocaine base. "A party challenging the sufficiency of the evidence supporting a jury conviction faces a steep uphill battle." *United States v. Graham*, 315 F.3d 777, 781 (2003). We have stated on prior occasion that a challenge to the sufficiency of the evidence poses a "nearly insurmountable burden." *United States v. Frazier*, 213 F.3d 409, 416 (7th Cir.2000).

In evaluating a sufficiency of the evidence claim, we must determine whether, " 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *United States v. Ramirez*, 796 F.2d 212, 214 (7th Cir.1986) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (emphasis in original)). "An appellate court will not weigh the evidence or assess the credibility of the witnesses. Only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt, may an appellate court overturn the verdict." *United States v. Ramirez*, 796 F.2d 212, 214–15 (7th Cir.1986) (internal citations omitted).

The burden on Flowers to establish that the evidence was insufficient to support his conviction is *particularly* great, given that Flowers failed to make a Rule 29 motion for judgment of acquittal on the possession of cocaine and cocaine base with intent to distribute charge in a timely manner (*i.e.,* at the close of the Government's evidence or within the seven-day period following entry of the jury's verdict), and thus waived an appellate challenge to the sufficiency of the evidence. *United States v. Archambault*, 62 F.3d 995, 998 (7th Cir.

1995). Flowers may obtain reversal only if he demonstrates a "manifest miscarriage of justice." *Id. quoting United States v. Baker*, 40 F.3d 154, 160 (7th Cir.1994).

To be convicted of possession of a controlled substance with intent to distribute under 21 U.S.C. § 841(a)(1), the Government must prove: (1) knowing or intentional possession of the drug (in this case, cocaine and cocaine base); (2) with intent to distribute; and (3) with the knowledge that the drug was a controlled substance. *United States v. Harris*, 325 F.3d 865, 868 (7th Cir.2003). Flowers contends that there was insufficient evidence to support the jury's finding that he was in "possession" of and thus responsible for the drugs found in Apartment 22 on May 4, 2001. Specifically, Flowers argues that the Government's evidence failed to establish a "nexus" between himself and the cocaine and cocaine base, and furthermore was insufficient to support that he was exercising "dominion and control" over the contraband.

Possession of a controlled substance may be actual or constructive. *United States v. Brown*, 328 F.3d 352, 355 (7th Cir.2003). Thus, "[a] defendant need not be caught red-handed in order to satisfy the possession element" of § 841(a)(1). *United States v. Starks*, 309 F.3d 1017, 1022 (7th Cir.2002). The Government "may prove constructive possession if it can demonstrate that the defendant exercised ownership, dominion, authority or control over the illicit material." *Id.* at 1022.

█ Despite Flowers's protestations to the contrary, the trial record holds ample evidence to establish that Flowers was in possession of the drugs recovered from Apartment 22. Again, we recall Flowers's admission that he had his own key to the apartment where the drugs were found, as well as the agents' discovery of his finger-

print on the plate beneath the crack cocaine (kitchen cupboard). Also supporting the Government's case, Emil Dahmers testified at trial that Defendant "kept [his drugs] upstairs [in Paul Cummings's apartment—Apartment 22]" (Tr. at 151) and that on the date of the drug bust (May 4, 2001), the Defendant had taken him (Dahmers) to that apartment, and, while he was seated at the kitchen counter, he (Defendant) had used his gym membership card to scoop the cocaine from a bowl (or a "plate") to a digital scale, prior to the sale. (Tr. at 155.)

Physical evidence recovered from the kitchen cabinet in Apartment 22—a plastic plate holding crack cocaine, Flowers's gym card, a digital scale—certainly seemed to corroborate Dahmers's testimony that when he and Flowers were inside the kitchen in Apartment 22, he had observed Flowers use his gym membership card to scoop "up [the drugs] and put [them] on the scale." (Tr. at 154–55.) The Government at trial presented the following confiscated items: Defendant's gym membership card, a digital scale, a bowl containing powder cocaine, and a plate holding around 80 grams of crack cocaine. Finally, considering also the fact that Flowers was found in possession of the *$300 in recorded buy money* (used in the Bennett–Dahmers transaction earlier that day), and that his cellular phone records documented that he had called Dahmers's phone number approximately 118 times over a five-month period (January through May, 2001), Dahmers's claim that he purchased cocaine from Defendant on a frequent basis, and that, on the date of the arrest, Defendant had sold him (Dahmers) drugs out of the

stash found in Apartment 22 was even more credible.

The Government's evidence establishes a most clear nexus between the Defendant Flowers and the cocaine and cocaine base found in Apartment 22, and furthermore the plethora of direct and physical evidence (scale, corner-cut baggies) supported that Flowers was involved in the distribution and sale of illegal drugs. We are convinced that the jury's verdict of guilt was clearly supported by the evidence. Affirmed.