In the

# United States Court of Appeals

## For the Seventh Circuit

No. 04-3159

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

FIDEL GARCIA,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 03 CR 421-1—**Amy J. St. Eve**, *Judge.*

ARGUED NOVEMBER 2, 2005—DECIDED FEBRUARY 28, 2006

Before COFFEY, EASTERBROOK, and WILLIAMS, *Circuit Judges.*

COFFEY, *Circuit Judge.* A jury found Fidel Garcia guilty of one count of conspiracy to distribute, 21 U.S.C. § 846, and one count of possession with intent to distribute cocaine, 21 U.S.C. § 841(a)(1). The district court sentenced him to two concurrent terms of 126 months' imprisonment and two concurrent terms of 5 years' supervised release. Garcia now contends that his conviction is illegal because the district court "deprived [him] of the presumption of innocence" by allowing an expert to testify that innocent parties do not attend drug deals. Garcia also argues, and the government concedes, that his sentence is erroneous under *United States v. Booker*, 543 U.S. 220 (2005). We affirm the

conviction, but vacate the sentence and remand the case for resentencing under *United States v. Schlifer*, 403 F.3d 849 (7th Cir. 2005).

## I. BACKGROUND

Garcia was arrested on April 19, 2003, during a DEA sting operation and subsequently indicted with two others caught in the sting: Juan Angulo-Hernandez, who worked at the construction company where Garcia was union steward, and Mario Jara, Garcia's brother-in-law. The indictment charged each of them with one count of conspiring to distribute cocaine and one count of possession of cocaine with intent to distribute.

At trial, the government presented evidence that on April 19, 2003, Angulo-Hernandez phoned Garcia, asking him for "six burritos, meaning six kilos of cocaine," for sale to DEA informant, Roger Woods. Garcia met with Angulo-Hernandez; later they were joined by Jara, who did not know Angulo-Hernandez. Garcia, Jara, and Angulo-Hernandez then went together to the meeting with Woods. Angulo-Hernandez drove Garcia's Ford Expedition, and Garcia accompanied him as passenger. Garcia directed Jara to follow them in a Nissan carrying six kilograms of cocaine.

Angulo-Hernandez met Woods as arranged, and then, at Woods's request, drove with Garcia to Woods's house, followed by Jara. Angulo-Hernandez and Jara entered the house with Woods while Garcia remained in the Ford Expedition. Some time later, Woods told Angulo-Hernandez and Jara that he wanted to see the cocaine. Jara went outside to speak with Garcia. When he came back, Jara took Woods to the Nissan and showed him the cocaine.

Next, Woods told Angulo-Hernandez and Jara that they needed to go to the home of one of his friends to complete the transaction. Woods drove his own car, followed by

Angulo-Hernandez and Garcia in the Ford Expedition and Jara in the Nissan. A short time later, the DEA and local law enforcement agents arrested Garcia, Jara and Angulo-Hernandez, and took them into custody.

In addition to direct testimony about the events preceding the arrest from Woods, his DEA handler, and Angulo-Hernandez (who provided evidence that Garcia was his drug source), the government submitted cell phone records that reflected calls between Angulo-Hernandez and Garcia, and between Garcia and Jara (but none between Angulo-Hernandez and Jara), as well as vehicle registration documents connecting Garcia (and no one else) with both the Ford Expedition and the Nissan.

The government also called Sergeant Robert Coleman who qualified as an expert in narcotics trafficking to testify to common practices in structuring drug deals. Over Garcia's objections, the court permitted Coleman to testify that none of the more than one hundred drug transactions he had personally observed had involved an innocent adult present at the scene. Furthermore, he explained that drug dealers typically do not allow people not involved in the transaction to be present because of the risk that they might leak the information to law enforcement authorities. In its closing arguments, the government emphasized this testimony, stating twice: "[y]ou heard . . . innocent third parties don't go to drug deals."

Garcia decided not to present any evidence in his defense and simply argued that the government's evidence was insufficient, relying on the presumption of innocence and on the fact that there was no evidence that he participated in negotiations with Woods. Among other things, he asked the jury to use "common sense" to reject Coleman's expert testimony, and warned them that they could not convict him because of his mere presence during the transaction. The district court issued instructions concern-

ing the government's burden of proof, the presumption of innocence, and the insufficiency of mere presence and guilt by association as a basis for conviction.

The jury found Garcia guilty on both counts set forth in the indictment. The presentence report ("PSR") recommended a base offense level of 32 for an offense involving at least 5 but less than 15 kilograms of cocaine, U.S.S.G. § 2D1.1(a)(3), (c)(4), and a two-level upward adjustment for a managerial or supervisory role in the offense, U.S.S.G. § 3B1.1(c). The PSR also recommended a criminal history category of II. These factors considered in combination with each other produced a guideline range of 168 to 210 months. Garcia, however, persuaded the trial judge that his Sixth Amendment rights under *Blakely v. Washington*, 542 U.S. 296 (2004), would be violated by application of the adjustment for his role in the offense and the second criminal history point that raised him to a criminal history category of II. The district court calculated the guideline range minus any adjustment for Garcia's role in the offense and using a Criminal History category of I. This resulted in a range of 121 to 151 months (just above the statutory minimum of 120 months, *see* 21 U.S.C. § 841(b)(1)(A)). Treating the guidelines as mandatory, the district court thought neither the high nor the low end of the range appropriate and imposed a sentence of 126 months.

## II. ANALYSIS

In framing his argument, Garcia suggests that he was deprived of his "presumption of innocence": by the admission of Coleman's expert testimony, and by the government's use of the testimony to argue in closing that he was involved in the drug deal. We treat the claims as one. Because the government's arguments did no more than summarize Coleman's testimony, any error with regard to them is adequately treated in addressing whether the admission of the expert testimony was error.

Initially we note that we have previously approved the admissibility of what Garcia himself admits is "substantially similar" testimony under the Federal Rules of Evidence. In *United States v. Love*, 336 F.3d 643, 645 (7th Cir. 2003), we considered expert testimony that it was "[un]common for persons involved in a drug conspiracy" to allow other people to be present who are not involved in the particular transaction. Because the expert did not refer to the intent of the defendant or to his mental state, we rejected the defendant's claim that the testimony violated Federal Rule of Evidence 704(b) (forbidding testimony from expert witnesses as to "whether the defendant did or did not have the mental state or condition constituting an element of the crime charged"). *Id.* at 647. Moreover, we have relied upon and repeatedly upheld the admission of testimony of the same general nature concerning "common practices of drug dealers and how typical drug sales occur." *Id.*; *see, e.g.*, *United States v. Cruz-Velasco*, 224 F.3d 654, 660 (7th Cir. 2000). We suggested at oral argument that such testimony might be impeached as inadequately scientific under Federal Rule of Evidence 702 (requiring expert testimony to be "based upon sufficient facts or data" and to be "the product of reliable principles and methods"), but this possibility cannot help Garcia because he did not raise a proper Rule 702 objection in the district court. The admissibility of Coleman's testimony thus is a high hurdle to overcome.

Garcia argues that the challenge he now brings is a different sort of challenge, but even if it is, it must fail because he has failed to demonstrate that Coleman's testimony did impact the presumption of innocence. The Supreme Court defined the presumption in *Taylor v. Kentucky*, 436 U.S. 478 (1978), as having two functions. It is first "a way of describing the prosecution's duty both to produce evidence of guilt and to convince the jury beyond a reasonable doubt," *id.* at 483, n.12; it also has the

special function of "'caution[ing] the jury to put away from their minds all the suspicion that arises from the arrest, the indictment, and the arraignment, and to reach their conclusion solely from the legal evidence adduced,'" *id.* at 484-85 (quoting 9 J. Wigmore, Evidence § 2511, at 407 (3d ed. 1940)). Thus, the presumption is violated when presentation of evidence at trial affects the quantum of proof required for conviction or when the jury is encouraged (or allowed) to consider facts which have not been received in evidence. Garcia has failed to demonstrate *either sort* of violation.

We understand him to be invoking the first function of the presumption of innocence when he implies that asking the jury to draw any inference that he knew of the drug transaction altered the quantum of proof required of the government. But his reasoning is flawed. Although some inferences may do so, the one at issue in this case does not because it was a rational inference of guilt and not a mandatory one. Non-mandatory inferences do not affect the application of the reasonable doubt standard unless "under the facts of the case, there is no rational way the trier of fact could make the connection permitted by the inference." *County Court of Ulster County, New York v. Allen*, 442 U.S. 140 (1979). *See also United States v. Turcotte*, 405 F.3d 515, 527 n.4 (7th Cir. 2005) (noting that a "non-mandatory inference does not place any improper evidentiary burden on the defendant as long as 'there is a "rational connection" between the basic facts that the prosecution proved and the ultimate fact presumed, and the latter is "more likely than not to flow from" the former'") (quoting *Allen*, 442 U.S. at 165). In *Turcotte*, in fact, we "prescribe[d]" an inference as to the defendant's knowledge of a certain fact necessary to prove guilt. *See Turcotte*, 405 F.3d at 527.

Coleman's opinion that it is unlikely for innocent parties to be present at drug deals is most logical and reasonable because it accords with expert experience as well as com-

mon sense. *See United States v. Starks*, 309 F.3d 1017, 1023 (7th Cir. 2002); *United States v. Zafiro*, 945 F.2d 881, 888 (7th Cir. 1991), *aff'd on other grounds*, 506 U.S. 534 (1993). *See also Allen*, 442 U.S. at 165 n.27 (invoking statutory presumption that all occupants of vehicle are considered to be in possession of dangerous drugs found in vehicle because legislature "[did] not believe that persons transporting dealership quantities of contraband are likely to go driving about with innocent friends or that they are likely to pick up strangers").

The inference of Garcia's involvement in the deal was also non-mandatory. Even when an inference is characterized as a legal presumption, it is non-mandatory (and there is no constitutional difficulty) as long as the presumption "leaves the trier of fact free to credit or reject the inference and does not shift the burden of proof." *Allen*, 442 U.S. at 157. But here the jury was never advised to treat the inference as a presumption. In *United States v. Burns*, 683 F.2d 1056, 1060 (7th Cir. 1982) (per curiam), we held that an inference contained in a jury instruction was non-mandatory because it was "not expressly labeled as a legal presumption." There is still less reason for concern in this case, because the inference was not directed by the court's instructions but only by testimony and argument. Indeed, it is difficult to conceive how the jurors could have construed the inference as mandatory, after the district court specifically instructed them not to convict Garcia solely because of his presence during the deal or because of his association with admitted drug dealers.

Garcia has also failed to demonstrate that Coleman's testimony interfered materially with what *Taylor* describes as the second function of the presumption of innocence: that of confining the jury's consideration to the legitimate evidence. *See Taylor*, 436 U.S. at 484-87; *United States v. DeJohn*, 638 F.2d 1048, 1057 (7th Cir. 1981). In *Taylor,* the Supreme Court suggested that there

*might* be an error of constitutional dimensions in the government's invitation to jurors to consider the defendant's status as a defendant to be evidence of his guilt. *Taylor*, 436 U.S. at 486-87. The Court distinguished "the suspicion that arises from the arrest, the indictment, and the arraignment" from "the legal evidence adduced." *Id.* at 485. Garcia contends that the government made the same mistake during his trial. But the government did not imply that Garcia was guilty because he was a defendant. It did not refer to his being a defendant at all. Moreover, the Court reversed the defendant's conviction in *Taylor* because of the district court's failure to instruct the jury in the presumption of innocence after the government's comments about the defendant's status. *Id.* at 490. This case is dissimilar because Garcia received the benefit of instructions on both reasonable doubt and the presumption of innocence.

Garcia further argues that permitting Coleman's testimony that drug dealers do not bring innocent persons to drug deals was tantamount to authorizing the jury to ignore the rule that mere presence does not support a conviction. But under the law of this circuit, by introducing Coleman's testimony, the government already had taken a step beyond reliance on mere presence. *See Zafiro*, 945 F.2d at 888 (holding that government established "more" than mere presence through expert testimony that "drug dealers do not discuss or deliver large quantities of illegal drugs in the presence of innocent bystanders"). "The mere-presence doctrine means just what it says—presence and nothing more." *Starks*, 309 F.3d at 1026. It means that the government is not permitted to ask a jury to convict a defendant just because he was found in proximity to illegal activity. *Id.* Coleman's testimony, however, adds to Garcia's mere presence at the deal. He was not only there; he was present when it was unlikely for an innocent person to be there.

*Zafiro* suggests that such expert testimony may be enough in itself to refute the allegation that the government

has relied on mere presence, *see Zafiro*, 945 F.2d at 888. But we do not have to resolve that question because the government did not rely exclusively on Coleman's testimony to carry its burden. It also pointed to several significant pieces of circumstantial evidence: Angulo-Hernandez's admission during his plea colloquy that Garcia was his source for the drugs he attempted to sell to Woods; the fact that Jara and Angulo-Hernandez did not know each other before the transaction (the jury could infer that those two would not have spontaneously cooperated in a wholesale-level drug deal without Garcia as guarantor of each other's trustworthiness); Jara's consultation with Garcia before showing Woods the cocaine; and the vehicle document which connected Garcia with the Nissan.

Finally, Garcia contends that *United States v. Booker*, 543 U.S. 220 (2005), compels resentencing. Although the district court ruled in his favor on his Sixth Amendment arguments, he points out that it still treated the guidelines as mandatory. Garcia did not specifically contest the mandatory application of the guidelines in the district court, but we have held that a Sixth Amendment challenge is "specific enough" to preserve an objection based on the mandatory character of a sentence. *United States v. Schlifer*, 403 F.3d 849, 854 (7th Cir. 2005).

The government suggests that we direct a limited remand under *United States v. Paladino*, 401 F.3d 471 (7th Cir. 2005), on the ground that Garcia did not "allege a violation of the Sixth Amendment or interpose an *Apprendi*-style objection." We disagree. Garcia expressly cited the Sixth Amendment, *Apprendi v. New Jersey*, 530 U.S. 466 (2000), *Blakely v. Washington*, 542 U.S. 296 (2004), *and* this court's decision in *United States v. Booker*, 375 F.3d 508 (7th Cir. 2004), in his "Memorandum in Aid of Sentencing" in the district court. He must submit to full resentencing under *Schlifer* as a consequence of maintaining this appeal.

On remand we ask the district court to consider the sentencing factors it felt constrained to exclude before, and

these will inform its exercise of discretion in selecting a new sentence. Garcia's risk of receiving a longer sentence is even greater than the risk faced by other defendants whom we have warned might not receive the benefit from resentencing they anticipated. *See United States v. Roche*, 415 F.3d 614, 620 (7th Cir. 2005); *United States v. Goldberg*, 406 F.3d 891, 894 (7th Cir. 2005). But the case for resentencing is nonetheless strong because the district court's remedy for the Sixth Amendment problem—which was simply to ignore sentencing factors that depended on facts not found by a jury—is inconsistent with the remedy chosen by the Supreme Court in *Booker*. After *Booker*, courts must "compute the guidelines sentence just as [they] would have done before," finding necessary facts under a preponderance standard, then "decide whether the guidelines sentence is the correct sentence to give the particular defendant." *United States v. Dean*, 414 F.3d 725, 727 (7th Cir. 2005). The district court's failure to consider whether a role adjustment was appropriate and whether an additional criminal history point was warranted means that it did not apply the guidelines properly, and this in itself is grounds for resentencing unless the government can show that the error was harmless. *See United States v. Berheide*, 421 F.3d 538, 542 (7th Cir. 2005); *United States v. Graves*, 418 F.3d 739, 746 (7th Cir. 2005); *Schlifer*, 403 F.3d at 854. The government concedes that it cannot do so because the record contains insufficient information to allow us to determine whether the district court's "choice of sentence would have been the same" under a correct interpretation of the guidelines. *Schlifer*, 403 F.3d at 855.

## III. CONCLUSION

We AFFIRM the conviction, but VACATE the sentence and REMAND the case for resentencing under *Schlifer*.

No. 04-3159                                          11

A true Copy:

    Teste:


                                _____
                                *Clerk of the United States Court of*
                                  *Appeals for the Seventh Circuit*