In the

# United States Court of Appeals
## For the Seventh Circuit

———————

Nos. 06-3201 and 06-3250

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ANTHONY GILMER and JAMAR BAILEY,

*Defendants-Appellants.*

———————

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 05 CR 8—**Milton I. Shadur**, *Judge.*

———————

ARGUED MAY 7, 2008—DECIDED JULY 18, 2008

———————

Before BAUER, POSNER and WILLIAMS, *Circuit Judges.*

BAUER, *Circuit Judge.* Anthony Gilmer and Jamar Bailey were indicted on two counts of conspiracy and drug possession charges in March 2005. Following a bench trial, the district court found Gilmer and Bailey guilty and sentenced them to 57 months' and 100 months' imprisonment respectively. On appeal, both raise several challenges to their convictions. For the following reasons, we affirm.

## I. BACKGROUND

In December of 2004, a confidential informant reached out to Untavious Davenport to see if he had a kilogram of heroin to sell. On December 21, an undercover DEA agent met with Davenport and the informant to negotiate the sale. Davenport agreed to sell the undercover agent the kilo for $102,000; a week later, Davenport asked his friend Cleon Wilson about obtaining a kilo of heroin. Wilson located a supplier named Jamar Bailey—a friend of Wilson's—and informed Davenport of the connection.

On January 3, 2005, while DEA agents conducted surveillance, the informant picked up Davenport in a black Escalade and drove to a parking lot of Cermak Mall in Chicago, where they were joined by the undercover agent to wait for the drugs. After Davenport spoke with Wilson on the telephone, he and the informant drove to Wilson's house to check on the status of the heroin. Bailey arrived a short time later, and Wilson introduced Davenport to Bailey. Bailey told Wilson he would get the kilo of heroin from "out west" and left the house.

Wilson, Davenport, and the informant left Wilson's house around 5:00 p.m. Later, Bailey called Wilson and told him that he had the kilo of heroin and that Wilson should meet him to consummate the deal. They agreed to meet at a laundromat parking lot at Cermak and Cicero Avenues. The Escalade parked across the street from the laundromat in an Aldi's parking lot.

Meanwhile, Bailey had called Gilmer looking for a kilogram of heroin, and Gilmer told Bailey that he would broker the deal. Gilmer approached Romeal Williams, an acquaintance who had supplied heroin to Gilmer in the past, to see if he could supply one quarter

to one half kilogram of heroin. Williams called his source, but only asked for 100 grams because he did not trust Gilmer. Williams obtained (what he thought was) 100 grams of heroin and called Gilmer. Gilmer told Williams to meet at the street corner of Jackson and Kostner; when Williams arrived, Gilmer and Bailey were waiting. As the three rode around in Williams' white Chevrolet Lumina, Williams showed the drugs to Gilmer. When the two vehicles arrived at Aldi's, Gilmer told Bailey to tell the occupants in the Escalade to meet them at a near-by Citgo station. Bailey got out of the Lumina and into the Escalade, with Wilson, Davenport, and the informant, and he relayed the information to rendezvous at the Citgo.

Once both vehicles arrived at the Citgo, the informant walked over to the Lumina and got inside. Williams handed him the heroin, but the informant noticed the package was not a kilogram as requested. He asked Williams whether it was a sample and handed the heroin back to Williams. At that time, DEA agents approached the Lumina and identified themselves. Davenport, Wilson and Bailey were immediately arrested; Gilmer and Williams ran but were promptly apprehended by the agents. At the time of his arrest, Williams possessed one bag containing two smaller bags of heroin and cocaine base.

Bailey, Gilmer, Williams, Davenport, and Wilson were each indicted on one count of conspiracy to possess with intent to distribute at least 100 grams of mixtures containing heroin, in violation of 21 U.S.C. § 846, and one count of possession with intent to distribute approximately 83 grams of mixtures containing heroin and 13.3 grams of mixtures containing cocaine base, in violation of 21 U.S.C. § 841 (a)(1). Williams, Davenport and

Wilson pleaded guilty to the conspiracy count and testified against Gilmer and Bailey at trial. Other evidence introduced at trial included records of phone calls made between Wilson and Bailey, and between Bailey and Gilmer; testimony from several DEA agents who conducted surveillance on that day; and Bailey and Gilmer's post-arrest statements, in which both defendants acknowledged that one kilogram of heroin was to be purchased. Bailey stated that Wilson knew someone who wanted a kilo, and that he "was along for the ride to make $200." Gilmer told the agents that Bailey called him looking to buy a kilo of heroin, and that he was the middleman who introduced Williams and Bailey.

The district court found Bailey and Gilmer guilty of both counts on January 10, 2006. The court credited the testimony of the DEA agents, as well as the testimony of the cooperating co-conspirators (with the exception of their conflicting testimony about the timing of events that day). The court also considered Bailey's post-arrest admissions only as to Bailey, and not to Gilmer, so as to avoid a *Bruton* problem. In finding that Bailey and Gilmer were guilty of the conspiracy charge, the court specifically held that Gilmer's conduct was inconsistent with mere presence at the scene of the conspiracy, finding that his actions and his admissions established him as a co-conspirator. As for the possession charge, the court found both defendants guilty under the *Pinkerton* theory of liability. The court analogized the conspiracy to a chain, each conspirator representing a link in a chain, with each link knowing at least one co-conspirator, but not always more than one. The court discussed Gilmer's role as the link between Bailey and Williams, and that Williams's testimony linked him to

the chain of the conspiracy. During sentencing, the court found that although Williams believed he was selling 100 grams of heroin, that belief did not equate to an agreement under the conspiracy theory. The court said that it would consider the 83.3 grams of heroin for sentencing purposes, but not the 13.3 grams of crack cocaine, because there was no evidence that any co-conspirator had agreed to or contemplated the purchase of crack. Bailey and Gilmer each filed motions for judgment of acquittal, which the court denied on February 7, 2006. These timely appeals followed.

## II. DISCUSSION

Gilmer and Bailey challenge the denial of their post-trial motions, arguing that the evidence presented at trial was insufficient to convict either of them on charges of conspiracy to distribute drugs. They also believe that the government failed to prove the quantity of drugs alleged in their indictments. Additionally, Gilmer argues that the government violated the Speedy Trial Act, and that the district court erred in admitting evidence of his prior uncharged criminal activity. We address each contention in turn.

First, Gilmer and Bailey argue that the government presented insufficient evidence to support their convictions, and that the district court should have granted their motions for judgment of acquittal. In asserting insufficiency of the evidence, a defendant carries a heavy burden. A court of appeals does not stand in judgment of the credibility of witnesses; rather that question is left to the sound discretion of the trier of fact.

To support a conviction for conspiracy, the government is required to prove that "two or more people agreed

to commit an unlawful act and the defendant knowingly and intentionally joined in that agreement." *United States v. Duran*, 407 F.3d 828, 835 (7th Cir. 2005) (citation omitted). Gilmer argues the government failed to prove an agreement between himself and the co-conspirators. Specifically, Gilmer maintains that he had not previously sold drugs with (or to) any of them, that he only knew one of the co-conspirators (Williams), and there was no consensus as to how the deal was to go down.

A defining characteristic of a conspiracy is a common agreement "to further a single design or purpose." *United States v. Thomas*, 520 F.3d 729, 733 (7th Cir. 2008). "The agreement need not be formal, and the government may establish that agreement, as it may other elements of the charge, through circumstantial evidence." *United States v. Taylor*, 116 F.3d 269, 271 (7th Cir. 1997) (citation omitted). The government must prove an understanding—explicit or implicit—among co-conspirators to work together to commit the offense. *United States v. Curtis*, 324 F.3d 501, 505 (7th Cir. 2003).

The district court accurately characterized this conspiracy as links in a chain. Within the span of a few hours, Davenport called Wilson and informed him that he needed a kilo for a buyer. Wilson in turn contacted Bailey, and Bailey proceeded to arrange the transaction. Bailey called Gilmer, and Gilmer called Williams, who was able to provide the drugs. The fact that Gilmer only knew Williams hardly supports his belief that he was not in an agreement with the other conspirators, for "[a] conspiracy does not need discussions between all parties—this is a classic links-in-a-chain conspiracy, with [the defendant] assisting [a co-conspirator] in distributing drugs down the chain." *United States v. Johnson*,

137 F.3d 970, 973-74 (7th Cir. 1998); *see also United States v. Price*, 258 F.3d 539, 545 (6th Cir. 2001) (finding that it is sufficient in a "drug-chain conspiracy" to show that each member of the conspiracy realized that he was participating in a joint venture, even if he did not know the identity of every other member, or was not involved in all of the activities in furtherance of the conspiracy).

In viewing the evidence in the light most favorable to the government, we find that Gilmer was in agreement with the other conspirators to further a single purpose— the distribution of heroin. Williams's testimony was particularly damning; he testified that he had supplied heroin to Gilmer in the past, and that Gilmer called him on the afternoon of January 3rd and asked him if he could get a hold of some "dope" for a cousin of Gilmer's friend. Williams obtained the heroin, or what he believed was heroin (it turned out to contain heroin and crack cocaine), and Gilmer directed Williams to pick him and Bailey up. As they were driving around, Gilmer asked if Williams had the drugs, and Williams handed them over to Gilmer for inspection. When they arrived at the designated meeting spot, Williams testified that Gilmer directed Bailey to tell the other conspirators in the Escalade to meet at the Citgo (within the city limits) to make the deal, because Gilmer did not "want to deal with the Cicero police."

Other evidence included Gilmer's post-arrest statements (corroborated by the testimony of a DEA agent), in which he admitted that he acted as "the middleman" between Bailey and Williams for the procurement of one kilogram of heroin. He stated that when he received a phone call from Bailey, who was looking for heroin, he put him on the phone with Williams to "work out the

details." The three of them met an hour later, and Gilmer
stated that he was present for the discussion about how
the deal would play out. Gilmer drove to the scene for
the deal, and after Bailey got out of the car, Gilmer
switched the meeting place when he saw a police car in
the area. After conferring with Bailey on the phone, he
went to the Citgo gas station so they "could do the deal
with the guy." When Gilmer saw the police, he ran to
avoid getting arrested. *See United States v. Moore*, 521 F.3d
681, 685 (7th Cir. 2008) (reasoning that evidence of a
conspirator "hightailing" it out of a pre-arranged meeting
place for a drug deal "bespeaks of guilty knowledge.").

There is ample evidence that there was a conspiracy
and that Gilmer was a knowing member of it. Gilmer
knew Bailey was a drug dealer and assisted him in dis-
tributing drugs to at least one dealer farther down the
chain of distribution, namely Wilson. There were six-
teen telephone calls between Bailey and Gilmer on the
afternoon of January 3rd, and these calls immediately
preceeded or followed conversations between Bailey
and Wilson, Wilson and Davenport, and Davenport and
the informant. Gilmer was at the scene where the deal
was to take place.  Gilmer's belief that the conspirators
lacked a "consensus" on how the deal was to be made
lends no support to his cause. *See United States v. Zarnes*,
33 F.3d 1454, 1466 (7th Cir. 1995) ("A conspirator need
not be overly involved with other conspirators, or be
aware of the details of the conspiracy, to be held responsi-
ble for the acts of the conspiracy."). Gilmer argues that
there was no evidence to show he had a financial stake
in the transaction, however the government need only
prove that Gilmer joined an agreement to distribute the
drugs. *See United States v. Larkins*, 83 F.3d 162, 167 (7th Cir.

1996) (rejecting the argument that a defendant is not a conspirator unless the government establishes that he has a financial stake in the overall distribution of the drugs). Because sufficient evidence existed to prove Gilmer's involvement with the conspiracy, Gilmer's argument that he cannot be liable for offenses committed by his co-conspirators under *Pinkerton* necessarily fails. *See Curtis*, 324 F.3d at 506.

We now turn to Bailey's challenge to the sufficiency of the evidence against him. Bailey believes that his statements, at most, reveal that he knew about the transaction and was present for the preceding events, and mere knowledge and presence cannot prove an agreement to participate in a conspiracy.

While it is true that presence alone is not enough to convict, a single act will suffice if the circumstances permit the inference that the presence or act was intended to advance the ends of the conspiracy. *United States v. Macedo*, 406 F.3d 778, 792 (7th Cir. 2005) (citing *United States v. Gutierrez*, 978 F.2d 1463, 1469 (7th Cir. 1992)). "[O]ne need not be at the heart of the conspiracy to be part of its web." *Curtis*, 324 F.3d at 506 (citation omitted). A conspiracy may be shown by evidence which shows that the co-conspirators embraced the criminal objective of the conspiracy, that the conspiracy continued towards its common goal, and that there were co-operative relationships. *United States v. Messino*, 382 F.3d 704, 709 (7th Cir. 2004) (internal citations omitted); *United States v. Starks*, 309 F.3d 1017, 1024 (7th Cir. 2002) (citing *United States v. Staten*, 581 F.2d 878, 883-85 & n. 60 (D.C. Cir. 1978) ("[T]he critical inquiry for judges is whether the factfinder can reasonably conclude from the proof that the accused likely had some appreciable ability to guide the destiny of the drug.")).

Bailey cites our holding in *United States v. Baker*, 499
F.2d 845, 848 (7th Cir. 1974) to support his proposition
that Bailey was simply "along for the ride," but his argu-
ment misses the mark. *Baker* held that criminal participa-
tion cannot be drawn merely from presence; a cul-
pable purpose is essential. In *Baker*, testimony revealed
that one co-defendant drove a car that one conspirator
rode in, engaged only in "small talk" at the location
where the drug transactions took place, and did not
participate in any conversations about drug dealing. In
reversing the co-defendant's conspiracy conviction, we
held that where a single act of driving a car that a con-
spirator rode in, without more, was insufficient evidence
to infer intent to participate or associate with a conspir-
acy. *See* 499 F.2d at 847-49.

Plenty of evidence linked Bailey to the conspiracy. Bailey
was more than simply a driver of the car or an observer
at the site of the transaction. The government's evidence
demonstrated that Bailey served as an intermediary in
the conspiracy, bridging the divide between a willing
buyer and seller by recruiting Gilmer to perform the
critical function of obtaining the heroin. *See United States
v. Rock*, 370 F.3d 712, 714 (7th Cir. 2004) (reasoning that
when defendants are on the same side of a sale of drugs
to a third party, there is sufficient evidence of a conspir-
acy). Bailey was in contact with Wilson throughout the
day on his cell phone, arranging the deal. Twenty-seven
calls were made between Bailey and Wilson that day.
Along with Bailey's own admissions in his post-arrest
statements (during which he confirmed that Wilson told
him he needed help finding some heroin because he
knew someone who wanted "a key"), the district court
credited his co-conspirators's testimony that Bailey
was involved in the conspiracy. Wilson testified that he

asked Bailey to get a kilogram of heroin for a friend, and Bailey promptly got on his cell phone. Later, Bailey came over to Wilson's house and told him he would get the kilo, and that he would let Wilson know when it was ready. Wilson stated that at one point, he and Bailey could not decide on a proper meeting place, and that when they ended the phone conversation, it seemed like the deal was off. But Bailey called Wilson back and told him that they needed the money and the deal should happen. Bailey and Gilmer drove to meet Williams, who showed Gilmer the drugs in the car while Bailey was present. Davenport stated that when Bailey got into the Escalade at Aldi's, Bailey questioned him about whether his people were the police, and asked about money. Both Davenport and Wilson testified that Bailey told them he wanted to leave the Aldi's parking lot because there were too many police in the area.

We decline to find that Bailey was simply "along for the ride," for common sense dictates that drug dealers want to minimize contacts throughout a conspiracy, therefore it is unlikely for innocent parties to be present at drug deals. *See United States v. Garcia*, 439 F.3d 363, 367 (7th Cir. 2006); *Starks*, 309 F.3d at 1023 (holding that the factfinder may infer that it runs counter to human experience to suppose that criminal conspirators would welcome innocent nonparticipants as witnesses to their crimes) (quoting *United States v. Batista-Polanco*, 927 F.2d 14, 18 (1st Cir. 1991)). We believe that there was sufficient evidence, beyond a reasonable doubt, that Gilmer and Bailey conspired with each other and with their fellow co-conspirators to distribute heroin.

Next, Gilmer and Bailey argue that because the government indicted the defendants for conspiracy to distribute at least 100 grams of heroin, they could only be

convicted on that count if the court determined that the conspiracy involved an amount greater than 100 grams. Drug quantity is not an element of the charged offense in the indictment. *United States v. Abdulahi*, 523 F.3d 757, 760 (7th Cir. 2008); *United States v. Thomas*, 328 F.3d 305, 309 (7th Cir. 2003) (holding that *Apprendi* does not make drug quantity an "element" of the offense under 21 U.S.C. § 841). Quantity of drugs sold or possessed goes to the severity of the sentence, not the existence of the crime. *United States v. Lechuga*, 994 F.2d 346, 348 (7th Cir. 1993).

Defendants also argue that, under *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), when a certain amount of drugs would increase a defendant's sentence above the statutory maximum, the quantity of drugs constitutes an essential element to a drug conspiracy offense that must be charged in the indictment and proved beyond a reasonable doubt. After *Apprendi*, any fact that increases the statutory maximum sentence must be proven to a jury beyond a reasonable doubt or admitted by the defendant. *Abdulahi*, 523 F.3d at 760. "But when a judge imposes a sentence below the statutory maximum, he may do so based on facts found by a preponderance of the evidence." *Id.*

The government's sting was intended to bust a deal to distribute one kilogram of heroin, but as more and more players became involved, what began as a deal for one kilo of heroin ended with a deal of a substantially lesser amount (83.3 grams of heroin and 13.3 grams of cocaine). The district court, recognizing the distinction between the amount charged in the indictment (at least 100 grams of heroin) and the amount actually possessed, held that it would consider the lesser amount for sentencing purposes, and sentenced both defendants under

21 U.S.C. § 841(b)(1)(C), which holds a maximum statutory penalty of twenty years. After a very thorough discussion of the factors listed in 18 U.S.C. § 3553(a), the court sentenced Gilmer to 57 months and Bailey to 100 months' imprisonment for each count, to run concurrently. *Apprendi* has no application to cases where the sentence is below the statutory maximum. *See Abdulahi*, 523 F.3d at 760. The district court correctly applied the preponderance of the evidence standard in determining the amount of drugs involved in the conspiracy. *See United States v. Belk*, 435 F.3d 817, 819 (7th Cir. 2006) (citing *Booker* for its conclusion that "judges may continue to make findings based on preponderance of the evidence, provided that they do not treat the Sentencing Guidelines as 'laws' with binding effect.").

Next, Gilmer argues that the district court erred in failing to dismiss his indictment as untimely under the Speedy Trial Act, 18 U.S.C. § 3161(b). Gilmer was arrested on January 3, 2005, and indicted on March 3, 2005, which Gilmer argues is well outside the Act's mandate that an indictment must be filed within 30 days of an arrest. Gilmer fails to consider an unopposed motion for an extension of time to and including March 4, 2005, filed by the government on January 19, which stated that the government needed more time to issue subpoenas for phone records, as well as to speak to other co-defendants who expressed interest in cooperating with its case. The district court made explicit findings to support the ends of justice continuance, stating that "the ends of justice served by this extension outweigh the best interests of the defendants and the public in a speedy trial . . . in light of the evidence that is important to this case . . . [and because] some of the defendants may seek to cooperate

with the government prior to indictment," which the Act allows for. Accordingly, the district court did not abuse its discretion nor did Gilmer suffer actual prejudice when the court granted a continuance under the Act.

Finally, Gilmer argues that the district court erred in admitting Williams' testimony about his prior drug trafficking activity with Gilmer because (1) the evidence was not intricately related to the charged conspiracy, and (2) the testimony was far more prejudicial than probative. The district court found that Gilmer's prior drug deals with Williams were relevant and admissible because the prior deals were inextricably intertwined to the charged offense. We review that decision for an abuse of discretion, *United States v. Price*, 516 F.3d 597, 603 (7th Cir. 2008), and conclude that the evidence was properly admitted.

Evidence of uncharged criminal activity is admissible if it is "intricately related to the facts of the case before the court." *United States v. Ward*, 211 F.3d 356, 362 (7th Cir. 2000) (internal quotations omitted). The admissibility of such evidence is limited only by Fed. R. Evid. 403 and is not subject to the limiting requirements of Fed. R. Evid. 404(b).[1] *Id.*; *United States v. Ramirez*, 45 F.3d 1096, 1102 (7th

---

[1] Rule 403 provides, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Under Rule 404(b), "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be

(continued...)

Cir. 1995) (finding that cases applying the "intricately related" doctrine have recognized that evidence concerning the chronological unfolding of events that led to an indictment, or other circumstances surrounding the crime, is not evidence of "other acts" within the meaning of Rule 404(b)). "Acts satisfy the inextricably intertwined doctrine if they complete the story of the crime on trial; their absence would create a chronological or conceptual void in the story of the crime; or they are so blended or connected that they incidentally involve, explain the circumstances surrounding, or tend to prove any element of, the charged crime." *United States v. Senffner*, 280 F.3d 755, 764 (7th Cir. 2000).

The prior drug deals explain the development of the relationship between Gilmer and Williams that led to their roles in the conspiracy. The earlier transactions explained how Williams and Gilmer met, and how, over time, Williams supplied heroin to Gilmer when he asked for it. As the district court put it, "why [else] would Gilmer come to Williams with a question as to whether he could obtain a quarter to a half kilo of heroin?" We have held in similar situations that testimony about prior uncharged criminal activity was intricately related to the charged conspiracy because it showed how the witness's relationship with a defendant "began, its basis, and structure, and how the relationship blossomed into the charged conspiracy." *See Ward*, 211 F.3d at 362 (holding that testimony from cooperating witnesses about

---

[1]  (...continued)
admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

their prior drug transactions with a defendant was intricately related to the facts of the charged drug conspiracy charges); *Zarnes*, 33 F.3d at 1469 (holding that evidence of drug transactions completed before conspiracy began was intricately related to conspiracy case because it showed how the relationship between the parties began and unfolded into the charged conspiracy). Moreover, in a bench trial, we assume that the district court was not influenced by evidence improperly brought before it unless there is evidence to the contrary.

### III. CONCLUSION

For the foregoing reasons, the convictions of Anthony Gilmer and Jamar Bailey are AFFIRMED.